UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .
          Plaintiff,               .  CR No. 13-0058
                                   .  CR No. 13-0059
     v.                            .
                                   .
JESSE L. JACKSON, JR.,             .  Washington, D.C.
SANDRA STEVENS JACKSON,            .  Wednesday, August 14, 2013
                                   .  9:30 a.m.
          Defendants.              .
. . . . . . . . . . . . . . .


TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Government:          MICHAEL M. GRAVES, AUSA
                             MICHAEL K. ATKINSON, AUSA
                             CATHERINE K. CONNOLLY, AUSA
                             ANTHONY D. SALER, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, NW
                             Washington, DC 20530
                             (202) 252-7566

For Defendant                REID H. WEINGARTEN, ESQ.
Jesse L. Jackson, Jr.:       WILLIAM L. DRAKE, ESQ.
                             BRIAN M. HEBERLIG, ESQ.
                             Steptoe & Johnson, LLP
                             1330 Connecticut Avenue, NW
                             Washington, DC 20036
                             (202) 429-6238

                             TRICIA PURKS HOFFLER, ESQ.
                             Edmond & Lindsay, LLP
                             334 Woodward Avenue, SE
                             Atlanta, GA 30312
                             (404) 525-1080

```
For Defendant                    DAN K. WEBB, ESQ.
Sandra Stevens Jackson:          THOMAS L. KIRSCH, ESQ.
                                 Winston & Strawn, LLP
                                 35 W. Wacker Drive
                                 Chicago, IL 60601
                                 (312) 558-5856

                                 CAROLYN PELLING GURLAND, ESQ.
                                 Carolyn P. Gurland Attorney At Law
                                 2 North LaSalle Street
                                 Chicago, IL 60602
                                 (312) 420-9263

Court Reporter:                  BRYAN A. WAYNE, RPR, CRR
                                 Official Court Reporter
                                 U.S. Courthouse, Room 4704-A
                                 333 Constitution Avenue, NW
                                 Washington, DC 20001
                                 (202) 354-3186
```

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
1                    P R O C E E D I N G S

2            THE DEPUTY CLERK:  Your Honor, calling criminal case

3    Nos. 13-58 and 13-59, the United States of America v. Jesse L.

4    Jackson, Jr., and the United States of America v. Sandra Stevens

5    Jackson.  The probation officer present for these proceedings is

6    Ms. McGill.  Counsel, please approach the lectern and identify

7    yourselves, the parties you represent, and your colleagues.

8            MR. GRAVES:  Good morning, Your Honor.  Assistant

9    United States Attorneys Matt Graves, Michael Atkinson, Catherine

10   Connelly, and Anthony Saler on behalf of the government.

11           THE COURT:  Good morning.

12           MR. WEINGARTEN:  Good morning, Your Honor.

13   Reid Weingarten, Will Drake, and Brian Heberlig for Jesse

14   Jackson, Jr.

15           THE COURT:  Good morning.

16           MR. WEBB:  Your Honor, Dan Webb on behalf of Sandi

17   Jackson.  Joining me as co-counsel are Tom Kirsch and Carolyn

18   Gurland, and of course Sandi Jackson is present at our counsel

19   table.

20           MR. WEINGARTEN:  I neglected...  I'm sorry.

21           MS. HOFFLER:  Your Honor, may it please the Court, I'm

22   C.K.  Hoffler on behalf of Jesse Jackson, Jr.

23           THE COURT:  Good morning.

24           MS. HOFFLER:  Good morning.

25           THE COURT:  All right.  We're here this morning for
```

1    two sentencings, for Jesse L. Jackson, Jr., and for Sandra

2    Stevens Jackson.   I want to accord each case and each defendant

3    the individual attention that they deserve, but since there's

4    some common overlapping issues that are going to be raised in

5    the two proceedings and I have some questions about how the two

6    matters interrelate, I intend to handle them in tandem this

7    morning rather than taking up all the issues in one matter,

8    imposing sentence in that matter, and then taking up the other

9    from the beginning.

10         So I plan to proceed as follows:   I first want to talk

11   about procedural matters just related to the review and the

12   acceptance of the presentence reports for Mr. Jackson and then

13   Sandra Jackson.   I'm going to go through the sentencing

14   guidelines calculations for each defendant and resolve any

15   disputes related to the guidelines.

16         Then I'd like to, rather than saving this for the end, talk

17   about forfeiture and restitution issues concerning Mr. Jackson,

18   at which point then we will move to the allocution for

19   Mr. Jackson, the allocution for Mrs. Jackson.   The Court will

20   take a recess, then the imposition of sentence for Mr. Jackson

21   and the imposition of sentence for Mrs. Jackson.

22         I recognize that this is a matter of some public interest

23   and that there are members of the press in the courtroom.

24   I want to make it clear that I don't want people disrupting

25   the proceedings by rushing out of the courtroom to communicate

information between the two sentences.

If you believe you'll need to do that, you're welcome to watch the entire proceedings from the overflow courtroom, which is Courtroom 5, and go in and out of there as you wish, or you can go to that room during the recess. But if you're seated in this courtroom for the sentencing of Mr. Jackson, I expect you to remain seated and remain courteous to the family and to the Court when I'm done, unless the Court announces a break and leaves the bench in between.

Can I ask counsel to approach the bench briefly for a moment? (Sealed Bench Conference)

THE COURT: All right. Mr. Weingarten, I guess I'm going to start with you, so why don't you come to the lectern. The final presentence report in this case was filed on June 26, 2013. Have both you and Mr. Jackson had the opportunity to read and discuss the presentence report?

MR. WEINGARTEN: Yes, Your Honor.

THE COURT: Are there any factual disputes that need to be resolved? Does the defendant have any objection to anything in the presentence report?

MR. WEINGARTEN: I don't think so. I believe we've agreed with everything with the government.

THE COURT: I take it the government doesn't have any objection or comment on any of the factual determinations in the presentence report either.

1          MR. GRAVES:  No, Your Honor.

2          THE COURT:  All right.  Hearing no objection by either

3     side, I'm going to accept the presentence report as undisputed

4     and my findings of fact at sentencing.

5       I don't believe there's any legal disputes that need to be

6     resolved either.  The government raised a question about an

7     aspect of the guidelines calculation that was different from the

8     presentence report than the plea agreement, but I'm going to

9     take that up when I talk about the guidelines calculation.

10        In addition to the presentence report, I've received a

11    number of additional materials concerning the defendant,

12    including the government's memorandum in aid of sentencing, the

13    defendant's memorandum in aid of sentencing which includes 129

14    letters from family members, friends, community leaders in

15    Chicago, members of Congress, therapists, and former constituents.

16        I've received the government's response to the defendant's

17    memo with a letter attached from the Bureau of Prisons, the

18    defendant's response to the government's memorandum, two

19    additional letters sent on behalf of the defendant and filed

20    with the Court by defense counsel, and then more than 50

21    additional letters to the Court filed, all of which were made

22    part of the docket, from a range of individuals including

23    constituents, friends, family members, business and community

24    leaders from Chicago, members of Congress, and private citizens.

25    I've reviewed all of this material.

1        Mr. Webb, have both you and Mrs. Jackson had an opportunity

2   to read and discuss her presentence report?

3            MR. WEBB:  Yes, Your Honor.

4            THE COURT:  I understand that the parties have agreed

5   to disagree about a factual representation made in paragraph 42

6   on page 14 of the statement of offense, which is also reflected

7   in the presentence report.

8        The statement of offense indicated that the defendant

9   received a total of $65,000 by a person identified as Person E

10  and that those funds were deposited in a bank account the

11  defendant maintained for her consulting business, Donatella.

12  These funds were not reported on the Jacksons' tax return.

13       There's a difference of opinion between the government and

14  the defendant between whether this $65,000 was a gift.  Since

15  the parties are agreed about the loss amount and it doesn't

16  affect the guidelines calculation, is it necessary for me to

17  resolve this dispute?

18           MR. WEBB:  No.

19           THE COURT:  I don't think so either.  I don't believe

20  that a determination one way or the other is going to have any

21  bearing on the application of the factors in the sentencing

22  statute.

23           MR. WEBB:  I agree.

24           THE COURT:  I think we're just going to leave that

25  where it is.  Do you have any objection or comment on any of the

1    other factual determinations in the presentence report?

2              MR. WEBB:  No.

3              THE COURT:  Does the government have any objection or

4    comments about the presentence report?

5              MR. GRAVES:  No, Your Honor.  We agree with the

6    Court's position with respect to the dispute and the fact that

7    the Court doesn't need to resolve it.

8              THE COURT:  All right.  So I'm going to accept this

9    presentence report also as undisputed and as my findings of fact

10   of sentencing.  I understand there is a legal dispute about the

11   applicability of the two-point enhancement about income derived

12   from criminal activity, and I'm going to take that up in a

13   minute when I address the guidelines.

14             MR. WEBB:  I understand, Your Honor.

15             THE COURT:  All right.  But I do want to note for the

16   record that I've received additional materials concerning this

17   defendant as well, including the government's memorandum in aid

18   of sentencing, the defendant's memorandum in aid of sentencing,

19   including 97 letters from friends, family members, former

20   colleagues, classmates, constituents, and members of Congress.

21       I've received the government's response to the defendant's

22   memorandum, the defendant's response to the government's

23   memorandum, additional letters sent on behalf of the defendant

24   and filed with the Court by defense counsel, including

25   yesterday, and approximately 43 other letters to the Court in

addition to the letters appended to the defendant's memorandum

from a range of individuals including constituents, friends, and

private citizens.  Every letter I've received, except for the

ones that were sealed upon the defendant's motions, are part of

the public record, and I have reviewed all of these materials.

MR. WEBB:  Yes, Your Honor.

THE COURT:  Thank you.

MR. WEBB:  Thank you.

THE COURT:  In a criminal case, there's a statute that

tells me how I'm supposed to go about deciding what the sentence

should be.  It's 18 U.S. Code § 3553.  It lists a number of

important factors, and the advisory sentencing guidelines are

one of the factors I must consider in determining the appropriate

sentence in these offenses.

What am I talking about?  Congress has created a

United States Sentencing Commission, and it has issued a set of

complex guidelines for judges to consider in determining the

sentence in a criminal case.

The commission has set out sentencing ranges for specific

offenses that can then be increased or decreased depending on a

number of factors, such as the amount of the loss involved, the

defendant's level of involvement, the defendant's prior criminal

history, and those ranges are contained in a guidelines manual.

Under the terms of the sentencing statute, the Court's

required to calculate what the guidelines would recommend in

every case, and this can be a somewhat tedious and technical
exercise, almost like an algebra problem.  The stated purpose of
this exercise is to eliminate some of the disparities that
existed before, between sentences imposed in different courts,
and to ensure that defendants who commit similar offenses are
treated in a similar manner, despite differences in their race,
income, education, et cetera.

So, as I'm required to do, I'm going to begin with a
calculation under the sentencing guidelines, but I note that
it's only one part of the sentencing analysis.

With respect to Congressman Jackson, Mr. Weingarten, I
understand that the parties have agreed to what the guidelines
would provide in this case.  For the offense of conspiracy to
commit the crimes of wire fraud, mail fraud, and making a false
statement, in violation of 18 U.S. code § 371, the base offense
level is 6.

Under §2B1.1 of the sentencing guidelines, that's increased
for certain characteristics of the offense.  Under
§2B1.1(b)(1)(H), it's increased by 14 levels for the amount of
loss in this case, which is over $400,000.

Under §2B1.1(b)(9)(A), it's increased by two additional
levels because the offense involves a misrepresentation that the
defendant was acting on behalf of a charitable or political
organization.

This was left out of the presentence report writer's

calculation, and there are arguments that could be made about whether it applies or not.  The government has provided me with case law that supports the applicability of the enhancement, and the defense has stipulated that it's applicable.

There are adjustments to the guidelines calculation. Under §3B1.1(c), because the defendant was an organizer, manager, or leader in the commission of this criminal offense, it's increased by two levels for his role in the offense.

Under §3B1.3, it's increased by two levels because the commission of the offense was facilitated by the abuse of a position of public trust.  That brings us to level 26.

The offense level is then reduced by three levels in recognition of the defendant's acceptance of responsibility, which I have been told was particularly early, candid, complete, and helpful, which brings us to level 23.

Neither party is seeking a departure within the sentencing guidelines in this case.  The presentence report investigation has found, Mr. Jackson, that you have no prior convictions, which puts you in criminal history category Roman Numeral I.

At level 23, with a criminal history category of I, then the U.S. Sentencing Guidelines would recommend a sentencing range of 46 to 57 months of incarceration, or just under four years to just under five years.  Within the structure established by the guidelines, this sentence falls within Zone D of the sentencing table, for which a sentence of probation is not

1    authorized.

2         Mr. Weingarten, I take it that you continue to agree that

3    that is how the guidelines are calculated in this case.

4              MR. WEINGARTEN:  Yes, Your Honor.

5              THE COURT:  All right.  And that's the government's

6    position as well.

7              MR. GRAVES:  Yes, Your Honor.

8              THE COURT:  All right.  And that's how I find that

9    they should be calculated here.

10        With respect to Sandra Jackson, the parties have largely

11   agreed as how the guidelines would be calculated, but they've

12   left the question of whether a particular two-level enhancement

13   applies up to the Court to decide.

14        For the offense of filing a false tax return which did not

15   fully state her income, in violation of 28 U.S. Code § 7206(1),

16   the base offense level, since the tax loss was greater than

17   $80,000, is level 16.  This is pursuant to §§ 2T1.1(a) and

18   2T4.1(f) of the guidelines.

19        The parties differ on whether the Court should apply an

20   adjustment under §2T1.1(b)(1), which calls for a two-level

21   increase if a defendant failed to report income greater than

22   $10,000 in any one year that was derived by criminal activity.

23   The advisory notes to the guidelines define "criminal activity"

24   as any conduct constituting a criminal offense under federal,

25   state, or local law.

1    I'll hear from the defendant first on the applicability of

2    this adjustment and the standard the Court must apply.

3        MR. WEBB:  Your Honor, we withdraw our objection to

4    that.  We reserved that in the plea agreement, but then when the

5    presentence report came out, we agreed with the presentence

6    report.  So we don't have an objection to that enhancement.

7        THE COURT:  All right.  I agree, and I would have

8    found that it applies.  It is true that U.S. Code 2 § 439(a),

9    which prohibits the conversion of campaign funds to personal

10   use, is not a criminal statute.  The conversion is a crime.

11   Mr. Jackson has pled guilty to the crime of conspiracy, and

12   Mrs. Jackson was the co-conspirator, and the unreported income

13   involved in the tax count is the fruit of that offense.

14   So under the calculation of the guidelines to which you now

15   agree, the two-level increase for funds derived from criminal

16   activity brings us to level 18.  There's a three-level reduction

17   for the defendant's acceptance of responsibility which has also

18   been described as early and very candid and helpful.  That

19   brings us to level 15.

20   Neither party is seeking a departure under the guidelines.

21   Ms. Jackson has no prior convictions, which puts her in criminal

22   category Roman Numeral I.  At a level 15 with a criminal history

23   category of I, that corresponds to an advisory sentencing range

24   of 18 to 24 months.  Level 15 also falls within Zone D of the

25   sentencing table, which designates the levels for which

 1    probation is not a permissible sentence.

 2        So that is how the U.S. Sentencing Guidelines bear upon the

 3    decisions the Court has to make this morning, and while the

 4    parties have all reserved the right to request a different and

 5    more lenient sentence, both parties have specifically agreed in

 6    their plea agreements that a sentence within the stipulated

 7    guideline range would be a reasonable sentence in light of all

 8    the factors set forth in the sentencing statute.

 9        Before I hear from the parties on the sentences that I

10    should impose, there are some issues related to the financial

11    aspects of the sentence that I want to address first rather than

12    saving them for the end of the proceedings.

13        As was agreed as part of the plea, the Court entered the

14    consent order of forfeiture in Mr. Jackson's case in the amount

15    of $750,000 on February 20, 2013.  On June 28 the government

16    filed a motion to amend the order to substitute certain

17    property.

18        On August 1 the parties filed a joint motion asking me to

19    stay consideration of that motion until October 25, 2013, while

20    the defendant continues to make his best efforts to satisfy the

21    money judgment.  The Court granted that motion and ordered that

22    the parties submit a status report on the progress of the

23    forfeiture and the status of the motion on October 25.

24        Are the parties asking me to defer entry of the final order

25    of forfeiture until that time as well?

1          MR. GRAVES:  No, Your Honor.  We'd ask that the order

2     be entered at this time and that we would file a status report

3     updating on the efforts to comply with the order.

4          THE COURT:  At which point, if it needs to be amended,

5     it could be amended?

6          MR. GRAVES:  No.  At which point, if the parties can't

7     resolve through the avenues they hope to resolve through, the

8     government would reassert the motion that it initially filed,

9     seeking liens against certain properties, including the house

10    and accounts.

11         THE COURT:  Now, the plea agreement also addressed the

12    subject of restitution, and it provided that Mr. Jackson agreed

13    to pay restitution, if any, in an amount to be determined by the

14    Court, citing both 18 U.S. Code § 3663, the provision that gives

15    the Court discretion to order restitution, and 3663A, the

16    Mandatory Restitution Victims Act.

17         The plea agreement contained language indicating that the

18    U.S. Attorney's Office agreed to make a nonbinding recommendation

19    to the Asset Forfeiture Money Laundering Section that any monies

20    obtained through forfeiture be distributed to the victims and be

21    credited through any restitution order.

22         As some people here might know, the interplay between the

23    statutory provisions governing forfeiture and restitution in

24    general is a matter of some interest to this court, but what we

25    need to talk about today is how they affect this case in

particular.

The government addressed restitution in the sentencing
memorandum, and it asked me to appoint a monitor to oversee the
unwinding of the campaign committee and the disposition of any
restitution that's paid.  In response to this proposal, the
defense observed, among other things, that the language on page
5 of the plea agreement concerning the nonbinding recommendation
meant the government is not advocating that the defendant pay
double.

Having been extremely surprised in another case to find out
that that language did not mean that at all, I want to ask you
first directly, are you asking me to order that the defendant
forfeit $750,000 and pay an additional $750,000 in restitution,
or are you asking me to order that he forfeit the $750,000 and
that he be ordered and that that be offset by any amount
obtained through the forfeiture?

MR. GRAVES:  It's the first, Your Honor, that the
Court order $750,000 in forfeiture so that the defendant turn
over the gains from the scheme, and that the Court order that
the defendant pay $750,000 to the campaign with the caveat that
a monitor be put in charge of the campaign for the winding down
of its activities, with the understanding that the government
would make a recommendation to the Asset Forfeiture and Money
Laundering Section of the Department of Justice that the
$750,000 forfeited to the United States would be used to satisfy

1   the restitution.

2           THE COURT:  But you're not indicating what the

3   Department of Justice's position is on that, just what your

4   recommendation would be.

5           MR. GRAVES:  That is correct.

6           THE COURT:  All right.

7       Mr. Weingarten, is that your understanding?

8           MR. WEINGARTEN:  Judge, I vigorously oppose that.

9   I mean, talk about form over substance.  There's a legal argument

10  to be had, and I'm prepared to make it.  But there's an intensely

11  practical issue here, and that's that my client wants to be able

12  to feed his children.  There is a limited amount of resources

13  here.  The comprehensive presentence report lays this out.

14      We've had a clear understanding with the government since

15  day one -- and we've had a wholesome, wonderful relationship

16  with the prosecutors; they've been hard but fair -- that coming

17  out of the Jackson household will be 750.  He is breaking his

18  head to make that happen before he reports, and we anticipate

19  being successful.

20      That was the point of the most recent motion.  We had a

21  grown-up conversation in their office; we laid out exactly what

22  we're doing.  But the idea that we're going to have a monitor,

23  pull some lawyer out of private practice to represent a defunct,

24  nonfunctional alter ego seems crazy to us.

25          THE COURT:  Well, I'm going to get to the monitor

1    issue in a minute.  I just right now want to make sure that what

2    they're asking me to do is order, in addition to the $750,000

3    forfeiture that's already been ordered, the full amount of

4    restitution without ordering an offset.  That's the government's

5    position?

6         MR. WEINGARTEN:  And we oppose that as vigorously as

7    we possibly can.  We see no point to that.  The Court is well

8    aware -- why would we have a monitor?  What would the monitor's

9    function be?

10         THE COURT:  All right. I'm going to take up the

11    monitor a minute.  I've read what you wrote.  I've thought about

12    it a lot.

13         MR. WEINGARTEN:  All right.

14         THE COURT:  Mr. Graves, is it the government's

15    position that restitution is mandatory, that this expense falls

16    under 3663?  Is conspiracy an offense against property as it's

17    defined by that statute?

18         MR. GRAVES:  Yes.  The government's position is that

19    restitution is mandatory if there's a qualifying victim here,

20    which is a big "if" under the circumstances of the case, the

21    government would concede.  But the statute itself, a conspiracy

22    to commit wire fraud, it is a qualifying statute.

23         THE COURT:  Okay.  That's an offense against property.

24         MR. GRAVES:  Yes.

25         THE COURT:  All right.  Let me go on, then.

1          The government takes the position that there's really no

2     difference between Congressman Jackson's campaign committee and

3     Congressman Jackson himself given the level of control that the

4     statement of offense indicates that he exercised and the

5     diversion of its assets for his benefit.

6          The government cites United States v. Emor, 850 F.Supp 176,

7     a district court opinion out of this court from 2012, for the

8     proposition that under those circumstances it would be

9     appropriate to decline to order restitution to the defendant's

10    alter ego at all.  The defendant advances the same argument.

11    But the government doesn't stop there.

12         Instead, it suggests that campaign committees ordinarily

13    get unwound.  So it asked me to appoint an independent monitor

14    to oversee the currently moribund committee receive the

15    restitution and then distribute it in accordance with the rules

16    governing the unwinding of a campaign committee.

17         As authority for my ability to do this, you point to

18    18 U.S.C. § 3663A(a)(2), which provides that if a victim to whom

19    restitution is owed is incompetent or incapacitated, the Court

20    can appoint a person suitable to assume the victim's rights

21    under the statute.  I'm going to hear from both of you very

22    briefly on this issue, starting with the government.

23         First of all, I want to know, is the campaign committee an

24    ongoing concern at this time?  Does it have any employees or any

25    assets?

1           MR. GRAVES:  My understanding is it does have assets

2     and it has not wound down, though one would have expected by now

3     it would have been wound down, and there's still a treasurer

4     associated with the campaign.

5           THE COURT:  But is that person employed by the

6     campaign?  Do they work at something else?  Is this in name only?

7           MR. GRAVES:  The person, my understanding, is not

8     compensated by the campaign.  It's a voluntarily position.

9           THE COURT:  Okay.  Do you have any authority for the

10    notion that the provision in the statute concerning an

11    incapacitated victim was intended to or does extend to an entity,

12    as opposed to a human; and if it does, that the presence of the

13    kind of conflict of interest here, the Emor problem that you're

14    talking about, actually constitutes incompetence or incapacity?

15          MR. GRAVES:  No authority either way, Your Honor.

16          THE COURT:  All right.  You note that in Emor the

17    school from which the money was diverted could continue to

18    function, but here the campaign committee is not an ongoing

19    concern.  Why does that distinction push in the direction of

20    restitution instead of in the other direction?

21          MR. GRAVES:  So from the government's perspective,

22    there's one key difference factually between Emor and this case.

23    And I'm going to answer the Court's question, but I'm going to

24    just back up one second.  We would, of course, concede this is

25    an incredibly close legal question from our perspective.

1      Our starting point is that we take very seriously the

2    mandatory nature of the Victims Rights Act, the provision that's

3    mandatory.  In thinking about the requirement by law that we

4    compensate victims, and looking at Emor, the one difference in

5    Emor from our perspective in this case is in Emor you had a

6    school that was not functioning as a school.  There's no way

7    that anyone wanted money going back to the school, even with the

8    defendant removed from the school, so that the original intent

9    of the money given to the school could be fulfilled: children

10    educated at that institution.

11      Here you have a campaign that by definition has to wind

12    down, and there are a lot of avenues --

13            THE COURT:  But the point of winding down is to deal

14    with the money that's left.  So if there's no money left, you

15    want me to give it money to give it reason to exist to wind

16    down.

17            MR. GRAVES:  Your Honor, we don't look at it quite

18    that way.  We're giving it money, the money that the defendant

19    stole, so that the campaign can expend those funds in a manner

20    consistent with the federal law; in other words, in keeping with

21    the donors' expectations.

22            THE COURT:  But it's not in the manner just like you

23    couldn't spend money anymore to educate children.  The point of

24    the money was for his campaign.  His campaign doesn't exist.

25    Yes, the law tells what you do with money that's left over, but

```
1    we can't ever use these funds for the purpose for which they

2    were intended.

3              MR. GRAVES:  Well, Your Honor, just as a matter of

4    campaign finance law, I would respectfully slightly disagree

5    with that.  Even if the campaign is not winding down, the

6    campaign is free to give money to a charitable organization.

7    The campaign is free to give up money to other local and state

8    political organizations, as the defendant's campaign did.  His

9    campaign legally gave vast amounts of money to his wife's

10   alderman campaigns.

11             THE COURT:  Well, what standards would the monitor

12   apply in choosing who to give the money to and how to effectuate

13   the purposes for which the money was given?

14             MR. GRAVES:  That would be up to the monitor.

15             THE COURT:  So there's nothing, there's no guidance

16   here, and you've also taken the position, it seems to me, when

17   you read your sentencing memo carefully, that the actual victims

18   here were the donors.  Paragraph 12 of your statement of offense

19   reflects that.  Is that also your position?

20             MR. GRAVES:  No.  That's not our position, and

21   paragraph 12 of the statement of offense -- I believe it was

22   paragraph -- court's brief indulgence --

23             THE COURT:  It says that they solicited funds from

24   donors without telling them what they really intended to do.

25             MR. GRAVES:  Yes.  So paragraph 12, from the
```

1    government's perspective, goes more to the 2B1.1(b)(9)(A)

2    adjustment, and it's not so much that the people to whom

3    misrepresentations were made were technically victims; it's a

4    harm done to the system, which is the logic of 2B1.1(b)(9)(A)

5    of you have individuals out there claiming to act on behalf of

6    political and charitable organizations, and regardless of what

7    the understanding is of anybody who was solicited and whether

8    they feel harmed or not, it does harm to these institutions as a

9    whole for the public to know that there are people out there

10   saying, hey, I'm collecting money for a political organization

11   when in fact they're collecting money for themselves.

12           THE COURT:  Well, if the harm is done to the system as

13   a whole, how do we have an identifiable victim under the

14   Mandatory Victims Act?

15           MR. GRAVES:  That would be the campaign.

16           THE COURT:  All right.  Thank you.

17           MR. GRAVES:  Thank you.

18           THE COURT:  Mr. Weingarten, is there anything you want

19   to add to what you put into your response to the government's

20   memo on this issue?  I'll hear you very briefly.  I don't think

21   I need to hear much from you on this issue.

22           MR. WEINGARTEN:  I get the point.

23     (Laughter)

24           THE COURT:  Okay.  Then I'm going to rule on this

25   issue.  There is no question that the defendant should not

profit from his years of ongoing, unlawful diversion of campaign funds for his own personal use and that his ill-gotten gains must be completely disgorged.  That is the purpose of the order of forfeiture.  And while the identification of the particular assets to be forfeited is still a matter to be determined, that process is ongoing.

While I disagree with the suggestion in the defense sentencing memorandum that this was a victimless crime when it was committed since it was Congressman Jackson's own campaign committee, I do not believe that there is a victim now to whom restitution can be paid under the terms of the statute, and I will decline to order restitution for the following reasons:

First of all, if it's the government's theory, and it is, that the victim is the campaign, the campaign is defunct.  It has no ongoing purpose, and funding it simply so that it can dispose of the money in the manner a real campaign would dispose of its excess funds makes no sense and serves no purpose.

Second, the government and the defense are agreed that the campaign is the defendant's alter ego and that it has no real existence independent of him, and that under those circumstances, the laws articulated in the Emor opinion would permit the Court to forego the restitution order.

Third, I don't think that the government's suggestion that I can appoint a monitor under the terms of the statute is supported by the text of the statute.  Even if one assumes that

an entity, such as a campaign committee, can be a "person" and
therefore a "victim" for purposes of the mandatory restitution
act, the government has provided me with no authority that would
support the notion that the provision permitting me to appoint
someone to act on the victim's behalf if the victim is
incompetent or incapacitated has any applicability to entities
at all.

The provision states, "In the case of a victim who's under
18 years of age, incompetent, incapacitated, or deceased, the
legal guardian of the victim or representative of the victim's
estate, another family member, or any other person appointed as
suitable by the court, may assume the victim's rights under this
section."  This entire provision speaks in terms that are only
applicable to human beings: age, family, deceased.

It seems to me that if Congress intended this very specific
provision to cover something entirely different, entities that
have been dissolved or nonexistent or compromised or dysfunctional
in some way, it would and should have said so.  I cannot simply
grant myself powers that are not in the statute, and I think the
Faior case out of the D.C. Circuit suggests that I have to
follow the terms of the statute and not make it up as I go along
by constructing an alternative remedy that has not been
specified by Congress.  That's at 699 F.3d 508.

Furthermore, it's a completely impractical and unworkable
suggestion.  The committee no longer exists, and it has no

ongoing function to serve if it did exist.  Basically, what
you're asking me to do is to create a new campaign committee,
from scratch, for the sole purpose of unwinding itself.

To me this means that it makes even less sense to impose a
restitution order in this case than it would have in Emor where
possibly the money could have benefitted actual students.  And
assuming I could find a suitable monitor, there are no principles
or standards that he or she could follow to distribute the money.
Which candidates or committees would be appropriate to support?

Finally, fourth -- not finally -- I think that given the
unity of interest between the committee and congressman, the
actual victims here, as hinted in paragraph 12 of the statement
of offense, were the donors.  In United States v. Pawlinski, 374
F.3d 536 out of the 7th Circuit, the court found in this similar
case that the donors were the victims when the candidate
converted campaign funds to his own use.

As far as I can tell from the data available on the FEC Web
site, there were over 600 donors to the campaign.  And that's
just in the last campaign cycle, and there may have been more.
Some of the donations were not itemized.

Therefore, this case falls within the provision in the act
that says that the section shall not apply when the number of
identifiable victims is so large as to make restitution
impracticable and the burden on the sentencing process of the
determining of the complex issues of fact related to the amount

1     of each victim's share would outweigh the need to provide

2     restitution.

3         That's 18 U.S.C. § 3663A(c)(3), and I believe the case law

4     supports this finding.  United States v. Martinez, 690 F.3d

5     1083, citing United States v. Oslund, 453 F.3d 1048, where the

6     8th Circuit said, "In applying the act, a burdensome,

7     complicated, or speculative calculation provides a good reason

8     for the district court to decline to exercise its discretion."

9         Finally, one important aspect of the conspiracy was the

10    falsification of submissions made to the House and the FEC.

11    Someone could also argue that the victim that was lied to at

12    bottom was, as you said, the system, the United States

13    government.  The people.

14        The forfeiture will be made into the government's Treasury

15    for the benefit of the people it represents, and in the provision

16    that sets forth the amount of any restitution to be ordered,

17    18 U.S.C. § 3663A(b)(1)(B) provides that the victim should be

18    reimbursed for the loss less the value of any property that has

19    already been received.

20        So, for all of these reasons, the Court will not enter an

21    order of restitution in Mr. Jackson's case.  The final terms of

22    the forfeiture order will be resolved at a status hearing on

23    Friday, November 1, at 10 a.m., after I've received the October

24    25 status report.

25        Now, Mr. Webb, we haven't talked to you much, but as I

understand it, your plea agreement provides for restitution as

well, and you're not making an argument that that money should

be offset by the $750,000, or are you?  Because no one has

briefed a word of that for me.

MR. WEBB:  Mr. Kirsch is interacting with the

government on this issue.  If it would be okay, I'd like to have

him address this issue.

THE COURT:  That would be terrific.

MR. KIRSCH:  Your Honor, we are asking that that

money be offset.  We learned of the government's position with

respect to what they were going to request of the Court Monday

at 5:30 p.m., so that's why this issue has not been briefed to

the Court.  The issue is set forth in paragraph 9 of the plea

agreement, of Ms. Jackson's plea agreement.

By the way, Your Honor, just as a sort of -- I guess a legal

matter, of course restitution -- the Court is not required --

THE COURT:  It's not mandatory.

MR. KIRSCH:  Correct.  Correct.  She agreed to pay

restitution because she wanted to demonstrate her complete and

total acceptance of responsibility for her actions.  So she

agreed to restitution as part of her plea agreement, but the

Court does not have to order restitution.

THE COURT:  Right.  But she agreed to it knowing that

he was forfeiting $750,000, and she agreed -- and there was a

pretty lengthy plea colloquy.  She agreed to pay the part that

1    she paid, which is calculated more as the tax loss than the

2    unlawful gain.  Now, I understand taxes would have been paid out

3    of the unlawful gain, but why should she not be ordered to do

4    what she agreed to do?

5           MR. KIRSCH:  Well, there's two things, Your Honor.

6    First of all, just sort of as a fundamental fairness point, she

7    would be paying tax on the $750,000 that the government is now

8    getting back in the form of forfeiture.  What the government is

9    requesting is that Mr. Jackson give the money back, the

10    $750,000, and then in addition to that she pay tax on the amount

11    that was given back to the government.  So the government is

12    getting paid twice.

13           THE COURT:  And all of that troubles me, but that was

14    clear at the time you entered your plea.

15           MR. KIRSCH:  Correct, Your Honor, but what the plea

16    says in paragraph 9 of the plea, the plea says, "Your client

17    agrees to pay restitution in the amount of at least $168,000 for

18    which your client will be jointly and severally liable."

19           THE COURT:  Which is an odd sentence in a single

20    person's plea agreement.

21           MR. KIRSCH:  Correct.  Correct.  But if you look at

22    Mr. Jackson's plea agreement, the government provides an offset

23    in paragraph 11 of his plea agreement for restitution.  So the

24    government takes forfeiture --

25           THE COURT:  Provides a nonbinding recommendation for

1   an offset.

2          MR. KIRSCH:  Correct.  So the government takes the

3   forfeiture from Mr. Jackson and then says they're going to make

4   a recommendation to the Asset Forfeiture Section, and it sounds

5   like they don't know what the asset -- we're here for sentencing,

6   and they don't know what the Asset Forfeiture Section's position

7   will be on this.

8       They say that any monies obtained from the defendant

9   through forfeiture be distributed to victims of the offense and

10  credited against any restitution order entered in this case.

11  So we're asking that from the Jacksons the government recover

12  $750,000.

13      Now, however the Court breaks that up in the particular

14  sentencing orders, if the government was to reduce the order

15  of forfeiture and then order Ms. Jackson to pay restitution

16  for a total amount of $750,000, that would be fine, or, under

17  paragraph 9 of the plea agreement, the defense would request

18  that the Court credit Ms. Jackson with the $750,000.

19      So once they pay the $750,000 in forfeiture, she gets

20  credit for that in the form of the restitution, so essentially

21  she doesn't have to pay $168,000 to the IRS in the form of

22  restitution.  Or, of course, like you said, although I want to

23  be careful, Your Honor, because we agreed to this in the plea

24  agreement and I don't want to be arguing something that the

25  Court should do that we agreed to in the plea agreement, but

1    of course there is the option for the Court not to order any

2    restitution at all so that the total amount forfeited by the

3    Jacksons was $750,000, which of course, Your Honor, you have the

4    presentence reports in this case.  That is not an insignificant

5    amount of money.

6              THE COURT:  I understand.

7              MR. KIRSCH:  And to require them to pay an additional

8    $170,000 on top of that $750,000, considering their resources

9    and considering that they would effectively be paying the

10   government twice --

11             THE COURT:  Right.  I understand your position.

12             MR. KIRSCH:  Thank you, Your Honor.

13             THE COURT:  Mr. Graves, now as I understand it, you

14   can't make the argument that we've dealt with in other cases and

15   then we were dealing with before that I don't have any discretion

16   here.  We're talking about discretionary restitution in her case

17   and not mandatory restitution.  Is that correct?

18             MR. GRAVES:  That is correct.

19             THE COURT:  So there's no legal impediment to my

20   making an offset part of any restitution order in her case.

21             MR. GRAVES:  Well, Your Honor, I'm not sure if there's

22   a legal -- I think the practical difficulties -- there might be

23   practical difficulties here, because what you essentially have

24   is a $750,000 forfeiture and a $168,000 approximately

25   restitution to the IRS.  And I understand it's all going to the

government, but there are different theories, and how just

logistically you match up a forfeiture order with a restitution

order that's going to a victim I think could present some

challenges.

THE COURT:  What is your position on whether I can or

should look to this family for $750,000, or whatever that is

plus $168,000?

MR. GRAVES:  Your Honor, our position is that the

Court should look for both from the defendants collectively.

A couple of points here.  First, we agree with the Court's

reading of the plea agreement that it seemed pretty clear that

this was going to be 750 plus the tax amounts.  So the fact

that we had a conversation on Monday where we talked about this

I don't think is relevant given the plain language of the plea

agreements.  Plus, whatever language --

THE COURT:  Well, I have to say, just with respect to

the U.S. Attorney's Office in general, the plain language of the

plea agreements when forfeiture and restitution is involved is

going to have to be a lot plainer.

I've already changed my Rule 11 inquiry to make sure that

this gets laid out at pleas and doesn't come up for the first

time at sentencing, because nowhere in these plea agreements

does the government ever say that it's duplicative or double.

There's a paragraph on one page about restitution, and 10 pages

later there's a paragraph about forfeiture, and nobody ever adds

1    it up.  So I think it could be plainer.

2            MR. GRAVES:  And I understand where the Court's coming

3    from on that issue, and that's the issue we just dealt with with

4    Mr. Jackson's plea where you have forfeiture and restitution in

5    the same plea agreement.

6        Here the government would respectfully submit that you have

7    a slightly different issue.  You have Mr. Jackson pleading

8    guilty to the substantive offense, stealing $750,000 from a

9    federal campaign, and consistent with the principles of

10   forfeiture, he's not benefitting from that.  He's giving that

11   $750,000 back.

12       Ms. Jackson has agreed to plead guilty to a tax offense.

13   Now, there are a number of different reasons that a tax plea

14   could be from her perspective advantageous as opposed to a plea

15   related to the actual thefts, but one effect of that is they're

16   pleading guilty to different crimes.  Her crime was not

17   reporting on her taxes income that she'd earned, and the

18   government thinks that with that crime, an appropriate financial

19   recognition is paying the taxes that were owed in the years that

20   they were due.

21       As far as the double-counting, I think the case law is

22   pretty clear that one can double-count.  We didn't brief this

23   because we didn't understand that the defense was going to have

24   this much of a concern over it, but there are a number of cases

25   -- and I can hand the cites to the Court later -- that talk

1    about this precise issue.

2         THE COURT:  I've read them, and I think they vary.

3    The critical factor is whether it's the same victim or not,

4    and here we're talking about the government.  And the government,

5    I think you're much closer to a double-counting situation than

6    in most of the case law that you're about to cite to me.

7         The bottom line is that restitution in her case is not

8    mandatory, it's discretionary, so it's part of the decision

9    I have to make in consideration of all the 3553 factors.  So

10   I think having heard from both of you on this issue, I'm going

11   to defer ruling on this until I impose her sentence and make it

12   part of the entire sentencing picture.  But I understand what

13   everybody's telling me here.  Thank you.

14         MR. GRAVES:  Thank you, Your Honor.

15         THE COURT:  I'd like to go ahead and turn then

16   to the allocution in this case.  Before I impose sentence in

17   Mr. Jackson's case, Mr. Weingarten, would the defense counsel

18   like to speak on the defendant's behalf?

19         And before you start, I do want to say that I read the

20   government's memorandum, I read your reply, and I did not read

21   the government's memorandum reference to the Blagojevich matter

22   to suggest that Mr. Jackson engaged in any wrongdoing whatsoever

23   relating to him, and I didn't take it that way.

24         The publicly known facts and the fact that he was a witness

25   in that prosecution indicate precisely the opposite.  I think

the prosecution's only point was that after he came under some

scrutiny, he changed his methodology.  That theory supported

their argument that there was guilty knowledge here and nothing

more, but you don't need to tell me that he didn't have anything

to do with that case, because I understand that and I didn't

take it that way.

MR. WEINGARTEN:  But I think that's a nice segue to

where I think I would like to start.

THE COURT:  All right.

MR. WEINGARTEN:  Where I'd like to start is to tell

you how I first met him, and in fact I first met Jesse in

connection with the Blagojevich investigation.  He retained me.

I didn't know him before.  In truth, he was never a target;

in truth, he was a critical witness at trial; and in truth,

I was there, and I believe his testimony was very important in

connection with the conviction.

And, I would say, I was a prosecutor in the Public

Integrity Section for years, and I've defended many public

officials.  I've prosecuted them; I've defended them; I know

them.  I found him to be a very special guy.  When Jesse is

Jesse, he's as charismatic, he's as charming, he's as kind,

he's as smart as anyone I've ever met.

But in connection with that representation, I saw something

else.  I saw aberrant behavior.  I saw behavior on the part of

my client that distressed me.  I saw Jesse at times as low as a

person can be.  I saw Jesse at times agitated for no observable

reason, and because of my own experience in the world with

friends and family, I had a hint to myself as to what was going

on.  But the representation terminated because the trial was

over and Jesse was done with The U.S. Attorney's Office in the

Northern District of Illinois.  We maintained a little bit of

contact until, of course --

          THE COURT:  Can you tell me when that was?

          MR. WEINGARTEN:  A couple of years ago.

          THE COURT:  Okay.

          MR. WEINGARTEN:  Then, of course, this business with

The U.S. Attorney's Office here started, and Jesse called me.

And I sort of quickly got my arms around the problem, as did he,

and Jesse had many reactions: I say first horror at the shame

and the distress that he brought to loved ones, including his

family members, many of whom who are here today; that he let

down his constituents, his colleagues in Congress.

    He immediately wanted to come to terms with the conduct,

and did.  I was sent to The U.S. Attorney's Office here almost

immediately, and we engaged.  He came to terms with his

wrongdoing at the outset.  He wanted to spare the government

the expense of investigation, and we completely cooperated.

    There was significant to-ing and fro-ing about giving

expenditures because he did have a completely political life,

and there were conversations over whether or not a particular

1    meal or a particular trip was legitimately political or

2    personal.  There was a lot of to-ing and fro-ing there, but

3    it was open, and in my view, it was consistent with complete

4    cooperation.

5        And most fundamentally, he accepted responsibility.  There

6    was never any question about that.  Obviously, the Court was not

7    here for the plea colloquy; I'm sure you read it.  I think sort

8    of in the history of Anglo-American jurisprudence, there are not

9    many instances where a defendant stood before a court and

10   accepted responsibility as openly and as repeatedly as he did.

11       THE COURT:  I have to say that that really leaped off

12   the page to me, and I've been distressed since the beginning

13   that the first time I lay eyes on these two people is the

14   sentencing.  It's not in my making, but I did my best to read

15   the pleas and try to divine something about their personalities

16   from that, and obviously I've gotten a lot of letters.

17       MR. WEINGARTEN:  I've never seen anything like it, and

18   I've been at many pleas.  He was very protective.  Part of his

19   acceptance of responsibility was to take it all on himself.  It

20   is true that others in his office were implicated in some of the

21   conduct.  He took full responsibility, and you'll hear repeatedly

22   today he wants to take full responsibility here today.  It was

23   his office, and it was his show.  That's how he sees it.

24       So that's what leads us to this courtroom for today, and so

25   where are we?  Where we are is I have a client who clearly

violated the law.  I also think, under 3553, there are powerful

extenuating and mitigating circumstances that I'd like to

emphasize.  I'd like to emphasize actually three, and these are

where we actually sort of crossed swords with the government.

I'm sure you read it in the sentencing memo, and I'm sure you'll

hear more about it today.

The first is we've never taken the position as a legal

matter that there's no victim.  Obviously, as a legal matter,

the campaign is a victim, and by saying what I'm about to say,

I'm not trivializing the offense committed.  But this is not

sort of a typical victim.

There are not widows and orphans surrounding the courthouse

wanting his head.  That's not what we have here, and I think

it's important to emphasize sort of real-world aspects of this.

And in no way, shape, or form am I trivializing the offense, but

I'm sure the Court -- I don't know if the Court knows or not,

it's a fact that there was a time in Congress where campaign

funds were essentially retirement funds.

Indeed, as far back as the '80s, a congressman who retired

and had money in the campaign could take that money home, and

it was viewed back then -- and I know this from the cases I

prosecuted in the Public Integrity Section -- this was their

piggy bank.  This was their retirement.  And the law changed, but

congressmen who were in office in the '80s were grandfathered in.

So there is an attitude on the Hill for many old-timers

that there is a close connection between the personal wealth of
a congressman and their campaign.  What's also true, for safe
seats, for congressmen who have safe seats and are not regularly
campaigning to survive either in a primary or in a general
election, and that's the majority of Congress these days, that
there is -- if you took a microscope and looked at the use of
all those campaign contributions, you would find a lot of gray.
And again, this is not to trivialize what has happened in this
case.

     We have pled guilty, and we pled guilty to a serious matter
with a very high guideline.  But it is important to -- this is
not Madoff.  This is not a Ponzi scheme.  Again, the courthouse
is not ringed with victims who are demanding his head.  It's
completely different, and I think that's a relevant point for
you when you're considering what the sentence should be.

     Second point, the government sort of trivializes our
argument that good service, good public service, is irrelevant.
My reaction to that:  Are you kidding?  When do you get credit
for being a good public servant?  It doesn't automatically come
in as part of the office.  There are good congressmen, there are
not-so-good congressmen, and there are lousy congressmen.  He
was a good congressman.  You get that from the letters; you get
that from the public record.

     Again, when I was a prosecutor, I prosecuted federal
agents, and there were prosecutors that took the position that

no matter what their heroism in the field, no matter what they

had done, no matter how many arrests they had, no matter how

many convictions they produced, if they stole money or if they

committed a crime, they get no credit for their good service for

the government.  As a prosecutor, I found that to be nonsense.

If not at sentencing, when?  When do you get credit for

that?  I think what's important for Jesse, he was not only a

good congressman, he not only supported causes that I actually

support, which is completely irrelevant, but as a person, he's a

good person, and you saw it in the letters.  Countless gratuitous

acts of kindness, they should count too.  Not doing it to get

reelected.  Doing it because this is who he was.

One letter -- there were many, but sort of one stuck out

for me.  When he was a kid, he had a friend who had a personal

issue.  This was the letter from Marty King.  Years ago a friend

of his got into a personal jam, and as a kid, he came up with

scarce money to support the guy, and the guy decades later wants

you to know it.  I think it's just emblematic of the guy.

So we would say that there is a difference between people

who have a history of gratuitous acts of kindness, who have a

history of legitimate and quality public service, and those two

don't.

Third point, Jesse's health.  This is perhaps the most

sensitive one, because every time we have this conversation, and

I'm sure you're going to hear it this morning, the government's

1    position is, well, we're sorry about that, but that has nothing

2    to do with what we're doing today; you're not suggesting a

3    million years, that the health issues were connected to the

4    wrongdoing; the wrongdoing was about greed and entitlement.

5         My suggestion here is they make a stick figure; they make

6    a cartoon figure.  This is not a stick figure.  This is not a

7    cartoon.  This is a flesh-and-blood guy.  We raised the issue of

8    his health and his mental health because it is relevant for your

9    decision.  If he had serious cancer, you would want to know.

10   If he had serious diabetes, you would want to know.

11        Well, it turns out he has a serious disease.  He's bipolar.

12   He's received significant mental health treatment.  The government

13   trivializes the letters because they say they're not long enough?

14   Are you kidding?  Those letters are incredible.  Those letters,

15   particularly from his doctor here, were powerful, and they sort

16   of lay out the situation that he's dealing with and has dealt

17   with.  I think they're incredibly relevant and incredibly

18   important.  You're sentencing the man, and part of the man is

19   that he suffers from a very, very serious mental health disease.

20        And again, he's not a stick figure.  He's a guy -- and it's

21   all before you.  He's a guy with an iconic dad who is here in

22   court and was the leader of the civil rights movement for

23   decades.  He's a guy who's been under a microscope his entire

24   life, who's had enormous expectations from the time he was born,

25   and he's a guy who has a significant mental health issue.

1    We're not passing off the criminal conduct, and we didn't

2    plead guilty by reason of insanity; but we want you to know

3    about it, and we think you should know about it.  We think it's

4    relevant, and we think it's relevant for all the obvious reasons.

5    Many of us in our personal lives know people who suffer

6    from this disease, and the disease affects cognitive decisions.

7    The disease affects judgments people make.  I'm not Dr. Freud

8    here suggesting this.  This is common knowledge, and it's beyond

9    dispute.  So the question is, with you taking into account all

10   these issues, where do we come out?  Where are we here?

11   Obviously, we're capped at five.  The government wants

12   four, and we want significantly less.  We want significantly

13   less for a lot of reasons, and I think the most important is we

14   have come to believe, for many reasons, that there's another

15   chapter here.

16   Jesse's basic qualities are that he has unlimited potential

17   to do more wonderful things in the world, and we have come to

18   believe, from our communications with his doctor, that with

19   discipline and with treatment, Jesse can be fine.  Jesse can be

20   fine once more, and we want that day to be as soon as possible.

21   As important, he adores his children, and he wants to have

22   a significant role in raising them and wants to be home just as

23   soon as possible.  There's fragility here.  We worry about him.

24   If he's incarcerated, he'll be in the loving care of the Bureau

25   of Prisons, and with no disrespect to the Bureau of Prisons,

1    I mean, frankly, we'd rather have him in the care of his

2    psychiatrist here than in the Bureau of Prisons.

3        The Bureau of Prisons, they're not evil, they don't try to

4    do harm to their prisoners who have health issues, but they're

5    completely overworked and they're completely understaffed.

6    We're concerned, and we want him home as quickly as possible.

7        And we are -- if begging would make a difference, I would

8    beg, but we are asking the Court respectfully for every minute,

9    every hour, every day, every week, every month off from the cap

10   as we can possibly get, and we would respectfully suggest that

11   the goddess of justice would not weep at an 18-month sentence.

12             THE COURT:  Let me ask you a question.  I want to talk

13   for a minute, since you've raised the prospect of a sentence of

14   any duration, the question of the designation of a particular

15   facility for me.

16             MR. WEINGARTEN:  Yes.

17             THE COURT:  Are you asking for the camp closest to

18   home, or are you asking for Alabama in particular?  The reason

19   I ask is that I was under the impression that there is a camp

20   closer to the District of Columbia, which is the one adjacent

21   to Loretto, and that would be closer to D.C. and his current

22   treating therapist.  I just wanted to make sure I knew exactly

23   what you were asking for.

24             MR. WEINGARTEN:  I could be wrong.  Sometimes the

25   designations are hard to discern.  Sometimes the difference

1    between a camp and a low-security facility is not entirely

2    clear.  Two reasons:  We want a camp, for obvious reasons, but

3    more important, we want to have him having as much freedom as

4    possible electronically, telephone and e-mail, to communicate

5    with his doctor.  So the camp designation is critically important

6    for that, and I frankly thought Alabama was the closest.

7            THE COURT:  Okay.  I think there's one in Loretto.

8    There's a prison, but then there's a camp adjacent to it, and

9    I think I can deal with this in the sentencing order if it comes

10   to that.

11           MR. WEINGARTEN:  Okay.

12           THE COURT:  I also would appreciate it if you would

13   address the issue of the order of sentences to be imposed in

14   the event there are sentences in both cases that involve

15   incarceration.

16       Mr. Jackson indicated that he wants to get on with it and

17   he wants to go first, but we've also talked about postponing

18   certain rulings related to the forfeiture so that he can get his

19   financial affairs in order.  We've talked about the fact that

20   he's right now undergoing treatment that's really making a big

21   difference, and --

22           MR. WEINGARTEN:  Sure.  I'm ready to go on that.

23           THE COURT:  Okay.

24           MR. WEINGARTEN:  Our view on that is we definitely

25   would like to wrap up the financial obligation before Jesse goes

1    in, and so if we get to the point of you asking for or setting

2    a report date, we definitely would want it after our hearing so

3    that we can report to the Court, and if he needs to deal with

4    banks, he's dealing with banks.  That's number one.

5         Number two, in terms of order, it is our fervent hope that

6    Sandi gets probation.  That's what we want.  We want it, from my

7    perspective, for the children.  She's -- whatever else that's

8    going on in this courtroom right now, I believe and certainly

9    Jesse believes she's a wonderful mother and her kids need her.

10   That's what he fervently believes.

11        So that under any circumstances, what's coming, if Jesse's

12   incarcerated is a traumatic time for these children, and it is

13   his view and we've discussed it extensively, that these children

14   are best served if he goes first.

15             THE COURT:  Okay.  Thank you.

16        Mr. Jackson, is there anything that you would like me to

17   consider before I impose sentence?

18             THE DEFENDANT:  Your Honor, throughout this process,

19   I've asked the government and the Court to hold me and only me

20   accountable for my actions.  I was the officeholder.  It was my

21   campaign.  I misled the American people.  I misled the House of

22   Representatives.  I misled the Federal Election Commission.

23   I misled the media by filing my reports.

24        I was wrong.  I don't fault anyone, including a decision

25   that you have to make today, and I hope that even those who

still support me don't hold any judgment against you based on a
job and a responsibility that you have.  I certainly have no
ill-will towards the officers of the Court -- Mr. Machen,
Mr. Cohen, Mr. Graves, Mr. Atkinson, Mr. Tebow, and I apologize,
Karen, for not remembering your last name -- for the work that
they did in bringing about the result of the truth of what I did.

I also want to apologize to my dad, to my mother.  Because
I'm an example.  I am.  (Pause)

Reid, this isn't just about me.  I am the example for the
whole Congress, and I understand that.  I didn't separate my
personal life from my political activities, and I couldn't have
been more wrong.  I take responsibility for my actions.  I'm
very sorry for what I've done, what I did.  My whole life was
political.  Everything I did was political.  Everything that I
considered to be part of the campaign, I just lived that way.

I know I let a lot of people down because of my conduct:
my constituents, my supporters, my friends, my family, and even
my wife, but most of all, my children.  I have only one request
today, and that is that my son and my daughter not suffer the
consequences of my actions.  They're still very young.  They
need their mother.

My wife has asked for probation.  I second that request.
If probation is not available to her, give me her time.  What
she did was a subset of what I did, a culture that I allowed to
exist in my campaign.

1    So I ask for Alabama so I could be as far away from

2    everybody for a while as I can be.  (Pause)  I want to make it a

3    little bit inconvenient for everybody to get to me.  My hope is

4    that my wife can earn enough money to keep our family moving

5    forward.  When I get back, I'll take on that burden.  By then I

6    hope our children will be old enough that the pain I've caused

7    will be a little easier to bear.

8    I've been many things in my life.  I'm a son, I'm an

9    activist, theologian, congressman.  Today I'm just a parent and

10   asking that this not extend to them.  I'll pay whatever

11   obligations I owe.

12   Mr. Graves, I don't think we have $168,000 after we pay the

13   750.  I certainly don't want the IRS harassing my family while

14   I'm away, so if I can pay them first and work out an arrangement

15   with the government to pay the balance when I get back, I will.

16   Thank you.

17              THE COURT:  Thank you very much.

18   Would the government like an opportunity to speak?

19              MR. GRAVES:  Yes, Your Honor.

20   Thank you, Your Honor.  Contrary to Mr. Weingarten's

21   reference, we do not view either of the defendants as stick

22   figures.  We've spent a fair amount of time, a lot of time, over

23   the last several months working to resolve this investigation

24   and talking with them, hearing their concerns.  We acknowledge,

25   and I think that's reflected in our briefs, that there's a human

element here and there are issues here that the government has
already credited and is advocating that the Court also credit.

But the fact of the matter is, there was a crime here, and
that's where the government thinks the Court should begin its
analysis of what's an appropriate sentence.  The defendant stands
before the Court for sentencing having admitted to orchestrating
a conspiracy to steal $750,000 from a federal campaign.  Both
the dollar amount stolen and the length of the conspiracy, which
lasted about seven years, are staggering.

There can be little doubt that this case represents one of
the most significant abuses of the campaign finance system for
personal gain that's ever been documented and prosecuted, and
that's why from the government's perspective, as the Court's
considering an appropriate sentence, the first and foremost
consideration, the paramount consideration, should be that the
sentence reflect the seriousness of the offense.

Again disagreeing with Mr. Weingarten slightly, there was a
reference to there's a lot of gray in a lot of people's campaigns.
Let's be clear here.  This wasn't the case of the government
going through FEC filings looking at just dinner expenses and
picking out a couple and saying, ah-ha, these were personal and
these were professional.  This was $15,000 for appliances at the
candidate's home in Chicago.  This is $10,000 for children's
furniture.  This is thousands and thousands of dollars for
clothing.

1    This isn't a case of gray where we're dinging the defendant

2    at the margin.  These were extreme abuses, and they're abuses

3    that strike at the integrity of the campaign finance system.

4    If a candidate and his wife can steal nearly three-quarters of

5    a million dollars and the two aren't severely punished, how can

6    future donors have confidence in the system?

7    As we set forth in our memorandum in aid of sentencing,

8    in the last election cycle there was nearly $7 billion spent,

9    with about $3.2 billion, according to one estimate, falling

10   through principal campaign committees like the one the defendant

11   stole from.  There's no indication that money spent on elections

12   is going to decrease in the future.

13   The government submits that the Court's sentence should

14   ensure future contributors that their contributions won't be

15   stolen by candidates because those candidates know, based on the

16   sentence handed down in this case, that politicians are going to

17   be hesitant to use campaign funds for personal expenditures in

18   the future.

19   In our memorandum in aid of sentencing, we cited several

20   cases where individuals were convicted for stealing funds from a

21   campaign, and we would submit that in those cases the sentencing

22   courts recognized the significance of this crime regardless of

23   the amounts stolen.

24   The best example of that is the <u>Taff</u> case we cited where

25   the candidate for Congress stole $300,000 for the purpose of

getting a certified check, and once he obtained the certified

check, actually returned the funds to his account.  So in

actuality, there was no actual loss.  That individual was

prosecuted, he pled guilty, and he was sentenced to 15 months.

Another case we cited involved an alderman in Milwaukee who

stole approximately $40,000, which is about 5 percent of the

amount that the defendant stole.  That individual got eight

months.  This is an incredibly serious offense that, regardless

of any other of the §3553 factors, warrants incarceration.

There are other factors from the government's perspective

that weigh heavily in favor of incarceration.  One of those is

the defendant's history, and the other is the circumstances

around this offense.  With respect to the defendant's history,

it's simply shocking, given the background he has, that he made

the criminal choices that he did here.

There's a lot that the government disagrees with in

the letters that have been submitted on the defendant's behalf,

but one recurring theme with which we do agree is that this is a

sad day that involves wasted talent.  The talent of which his

supporters speak is reflected in his resume.  He was born into

the civil rights movement, he learned from it, and he gave back

to it.

In addition to this invaluable education that he got on

the home front, he also received his formal education at elite

institutions: St. Albans, North Carolina A&T, and the University

of Illinois School of Law.  The government, though, has a different take on the significance of that resume, of those talents, at sentencing.

The government sees those talents as advantages, most of which he earned through hard work, but they indisputably gave him the tools and the compass he needed, when confronted with the opportunity to commit a crime, to choose not to commit a crime.  The fact that the defendant stole, in spite of that resume, in spite of those talents, from the government's perspective is a factor that weighs against him at sentencing.

It's also hard to imagine a case where the term "waste" could be more accurately applied, and the term applies on several different levels.  First, during the entire seven-year period of the conspiracy, there was no need, based on the defendant's family's needs, for him to have done this.

We set this argument out in our memorandum in aid of sentencing and I won't repeat it here, but throughout the duration, they were in the top 10 percent of household earnings in the United States.  In 2011, their combined income from his salary as a congressman, his wife's salary as an alderman, and the consulting fees she received from the campaign was nearly $350,000, which put them in the 97th percentile.  There was just no need for this conduct.

Waste also applies in terms of what the funds were used to purchase.  On the one hand, you have the luxury goods that his

family didn't need.  On the other hand, you have the basic goods

and service, the serial use of campaign funds for dry-cleaning

and grocery expenses, which the family easily could have

afforded based on their household income.

A lot of times, Your Honor, in cases like these,

embezzlement cases, we see that there's some kind of hardship

that the defendant suffered: a loss of a job, a loss of a home,

a loss of a loved one, something that changes the financial

circumstances of the defendant that drives them to make a bad

criminal choice.

We simply don't have that here.  We just have the defendant

desiring to obtain items that even his substantial resources

from his lawful income could provide for him and being willing

to take campaign funds to get those.

Finally, with respect to the circumstances of the offense,

there are two important things to know from the government's

perspective.  I think it was bad enough that the defendant stole

from the campaign, but in 2009 when he expanded the scope of the

conspiracy and began using others and implicating others in his

crimes, that's problematic from the government's perspective

because at the time, contrary to now, the defendant didn't show

any concern for those individuals and the fact that he was

bringing them into the criminal conduct that he was committing.

The second is the timing.  I'm not going to spend a lot of

time on it.  The Court understands where the government comes

from.  I think it's incredibly significant that at a time when

the defendant is under public scrutiny, even though he himself

has done nothing wrong in connection with his dealings with

former Governor Blagojevich, he's deciding to essentially double

down on his criminal conduct and that he goes before the public

and states during this time that he had "no involvement

whatsoever in any wrongdoing" at a point where he had already

stolen hundreds of thousands of dollars in connection with this

conspiracy.

By far, from the government's perspective, the major factor

that weighs in defendant's favor is his cooperation with the

investigation.  The defense has alluded to it, we're not going

to dispute it, and we have to concede that it is incredibly rare

that mid-investigation the government receives a call from

counsel for the defendant saying that we understand that there's

an investigation and we want to come in and talk to you about it.

And that conversation isn't, You're misunderstanding the

situation; there's no wrong here.  Instead, it's we're conceding

up front that there are problems and we want to help you resolve

this investigation expeditiously.  The defendant deserves

substantial credit for that, and from the government's

perspective, we've provided that in part.

We took that credit, and many of the arguments that the

defendant's making for a sentence below the guideline, into

consideration when thinking about, among all the options, what

charge we were going to make a component to the plea.  We submit

that the defendant's range, as it is, reflects the fact that

we've given consideration, and I think that's borne out by the

fact that when you compare the defendant's case to the other

cases we identified that involve thefts from campaigns, the

defendant's on the low end of the scale when you control for the

dollar amount stolen.

We've also taken the primary concern, which was repeatedly

expressed by both the defendant and his wife, into

consideration, which was the children and the fact of both

parents being incarcerated at the same time, and we have

affirmatively come forward and asked that their sentences be

staggered.

Now I'd like to briefly address the two primary arguments

I hear from defense counsel about why the defendant should be

sentenced below the applicable guideline range.  The first is

mental health, and the second is the good works he's performed.

With the mental health argument, from the government's

perspective it is critical to begin with the recognition of the

fact that defendant is asking for a variance, and because the

defendant is asking for a variance, he is the one with the

burden when making the argument.

The information he provides the Court must enable the Court

not only to articulate a basis for why it is appropriate to

grant a sentence below the applicable guideline range but also

to explain how the amount of the reduction ties to the reason
expressed.  So against that backdrop, let's look at what's been
provided.

     There's not even an agreement among his doctors about what
exactly he's suffering from.  As our letter from the Bureau of
Prisons points out and as their own letters point out, the
diagnoses from the two doctors are similar, but they're different.
There's no explanation of what his current treatment regimen is.
We don't even know what his medical needs precisely are.  In
short, the defendant provides almost no information justifying
that he needs a variance.

     No one is disputing that the defendant has the diagnoses
that he has.  No one is disputing that the diagnosis, whichever
the two it is, could be relevant at sentencing.  What the
government is disputing is the quality of the evidence before
the Court in terms of giving the Court information the Court
needs to decide what to do with it.

     Even though the government doesn't have the burden on this
argument, it would submit it's presented its clearest evidence
in terms of the Bureau of Prisons' ability to meet the needs of
the defendant with the joint letter from the Psychology Services
administrator and the chief of psychiatry of the Bureau of
Prisons, which states that based on the limited information
provided, they could accommodate or they're willing to bring in
outside help to provide the defendant with the services that he

needs.  So on that argument, there's no basis for a
below-guidelines sentence.

Before transitioning away from mental health, there's one
other suggestion that appears throughout the filings, the
supporters' letters, and even in the argument today, and that's
somehow that the condition caused or contributed to the conduct.
It's kind of a diminished-capacity type argument, essentially.
In brief, there is no evidence that this occurred.  It's not
something that a doctor that examined the defendant is saying.
It's just speculation from the defendant's supporters and an
article that lawyers cite.

When non-doctors start talking about features of mental
health disorders and what impairments could possibly ensue and
the significance of a scholarly article, the DSM -- the
Diagnostic and Statistical Manual of mental disorders -- states
we're in a dangerous zone.  It explicitly warns in the
introduction that determinations about diagnoses and impairments
should be left to doctors.

It notes that a diagnosis or a disorder does not
necessarily mean that a person suffers from certain impairments
from a legal perspective or that those impairments were present
at the time that the crimes were committed.  These are all
things you need an expert here for.  The truth of the matter is
that when someone is actually litigating a real contested mental
health issue, none of the things that are normally done --

expert testimony, discovery, examination of the defendant --
were done here.

Once one digs behind the diagnoses and the conjecture and
just looks at the facts, it's quite clear that there's no
"there" to there, and the government would respectfully request
that the Court disregard the defendant's unsupported arguments
regarding why, based on his mental health condition, a variance
would be appropriate here.

Finally, as the cases we have cited have made clear, the
defendant does not deserve credit for doing his job as a
congressman.  That was his job.  It was a job he was paid well
to do.

Now, if the Court finds beyond the arguments of legislation
that was passed, work done for his constituents, items done or
steps taken in his personal life, of course that's different,
but we're focusing now on a lot of the arguments about
legislation and work done directly for his constituents, because
that type of work built the goodwill with the constituents that
allowed the defendant to get easily reelected election after
election and consequently to continue the conspiracy.

The legislative successes that the defendant's supporters
cite to do not serve as a basis for a sentence below the
applicable guideline range.  They do serve as a reminder of the
waste, of the wasted talent of what defendant threw away when he
decided to prioritize his own needs and desires over the needs,

1    hopes, and desires of his constituents and supporters.  The waste

2    is tragic, but the crime is serious, and it's a crime that

3    warrants a sentence within the applicable guideline range.

4    Thank you.

5              THE COURT:  All right.  Thank you, Mr. Graves.

6        What I'd like to do before we go on to the allocution for

7    Ms. Jackson is to take a break, primarily for the benefit of the

8    court reporter but probably for everyone else as well.  So you

9    can remain seated, but we will resume at 10 after 11:00.

10             (Recess from 11:00 a.m. to 11:22 a.m.)

11             THE DEPUTY CLERK:  Recalling criminal case Nos. 13-58

12   and 13-59, United States of America v. Jesse L. Jackson, Jr.,

13   and the United States of America v. Sandra Stevens Jackson.

14             THE COURT:  All right.  That was slightly more than

15   10 minutes.  I apologize, but probably everybody needed it.

16       Mr. Webb, are you prepared to speak on behalf of

17   Mrs. Jackson?

18             MR. WEBB:  Yes, Your Honor.  Thank you very much.

19       Let me start and state the obvious.  Where things stand

20   with Mrs. Jackson in this sentencing is that you've determined

21   the guideline range of between 18 and 24 months, the government

22   is recommending an 18-month jail sentence, and Your Honor has

23   recognized that under the law the guidelines are advisory,

24   they're a benchmark, a starting point.

25       They're a factor to be considered, but there are powerful,

powerful reasons under 3553 factors that I would like to touch upon today to just strongly urge Your Honor to impose a sentence of probation and no jail sentence, and I'm going to walk through those factors.

The most powerful one, and the one I'm going to emphasize the most is the fact that if a jail sentence is imposed on Sandi Jackson, there's going to be enormous harm to two young children who are going to lose their mother.  I'm going to talk about that in a little detail, but first let me talk through some of the other 3553 factors that I just respectfully urge the Court to consider in reaching a decision at the end of the day, at the time of sentence today, of probation.

Number one.  As far as 3553, the nature and circumstances of the crime and her acceptance of responsibility, Your Honor, what happened here, I've never had a case resolve this quickly. From the time that she asked me and my firm to start meeting with the government prosecutors to try to sort out, she wanted to accept responsibility, she had made mistakes in judgment, and Your Honor, it took between three and four weeks from the time we started meeting with the government to the time she pled guilty in front of a federal judge in this courthouse.  I've never had anything even remotely like it.

Her desire, her overwhelming compulsion to admit what she had done wrong, to acknowledge what she had done and to put it behind her and to instruct me and Tom Kirsch to cooperate with

the government because they were -- I'll use the word
"struggling" -- because it's not easy-lifting to figure out
which of these should be considered personal and which should
be considered campaign.

We could still be today -- we could try a three-month case
and still litigate over a lot of these expenditures.  Instead,
we did not do that.  We worked with the government, we cooperated
with them, and this got done and over with very quickly.

That's why -- I have the government's submission here.
When I have the government agreeing with me that there's a
powerful mitigating factor here, which is her acceptance of
responsibility, and the fact that, as they said, we worked
diligently to resolve this investigation, they were still trying
to sort out what was personal and what was campaign-related and
that this helped them close out the investigation because of her
cooperation.

It allowed the government to conclude the investigation in
the most efficient, expeditious and effective manner, and allowed
it to conclude much sooner than it would have if we had not done
that.  I've never had anything like that.  She wanted to put it
behind her.  So I believe that at least one 3553 factor that
strongly points in the direction of probation is her acceptance
of responsibility and the fact that she cooperated extensively.

Secondly, I want to talk a little bit about the nature and
character and history of Sandi Jackson, because that's one of the

3553 factors that is obviously important.  Who is she?

Who is she?  What has her life been about?  What is her

character?  We submitted I think 197 letters, and then 25

more came in, unsolicited I think by us, that came in.  There's

two things that emerge from her entire life, from a child up to

where she is today.  Two things have dominated Sandi Jackson's

life.

Number one is devotion to family, and number two is her

desire to participate in community and public service to help

disadvantaged people.  I'm going to talk about that a little

bit.  It's in the letters; it's in our submission.  I know Your

Honor's read them all.  I'm not going to take a lot of time on

it; I just want to touch upon it and then move on. But it is

pretty extraordinary.

Early in her life, the letters show us that even early in

her life she was focused on service to her family and the

community.  As a kid, growing up in -- she grew up in Akron,

Ohio, in the inner city in Akron, but you can see it from the

letters, her brothers and sisters give her credit for being the

role model to allow every one of her sisters to go to college

and get a college degree.  She did that as a kid growing up as a

role model.

Early in her life she was already reaching out and

participating in community outreach programs, and then she was

encouraging her friends and others to do so, as set forth in

1    several of the letters.

2         After she graduated from college, she took a job at a

3    television station but was known for the fact that she was a

4    voice that she used in that position to stand up for those less

5    fortunate, and she carried that forward to later in life when

6    she got elected to the Chicago City Council as an alderman for

7    the 7th Ward between 2007 and 2013.

8         I want to talk about it briefly, because it's in the

9    letters, but, Your Honor, that's a trouble ward.  It's a

10   difficult ward.  It may be within Chicago -- the 7th Ward in

11   Chicago is one of the most challenging areas in the city because

12   of its high crime rate and because of the economic challenges

13   that that community faces.

14        When you read over our sentencing submissions and the

15   letters we submitted, I understand the government's argument

16   that we're not going to just give someone credit because they do

17   their job as a public official.  I'm not even arguing with that,

18   but she did much more than an alderman just doing her job in the

19   7th Ward.

20        What you see from those letters is that she was constantly

21   involved as a champion for disadvantaged children, and she was

22   constantly trying to be an advocate for the disadvantaged.  She

23   did that through leadership, she did it through an extraordinary

24   amount of hours of work in that community, and she did far more

25   than one would say someone has to do to be an alderman in the

1    city of Chicago.  And it's in the letters.

2         I'm going to refer to three quick ones because I think they

3    tell the story.  Number one.  It's Bonita Parker who used to be

4    her chief of staff.  It's tab 1 in her letter.  She talked about

5    in some detail what Sandi Jackson did to try to be compassionate

6    with families that had suffered the enormous loss of having a

7    child as a victim to gun violence in that community.  This is a

8    quote from her chief of staff:

9         "I went with Sandi as she visited the homes of families

10   who lost their children to gun violence.  I watched as she wept

11   and prayed with the families and extended real, true compassion

12   and heartfelt sympathy for their trauma."  She did that over

13   and over and over again because her nature from the time she was

14   a child was to be compassionate and to be a spokesperson for

15   those that are disadvantaged.

16        The second example I found very interesting was a fellow

17   named Brian Gardner.  It's tab 9.  Brian Gardner in Chicago, we

18   call them the ward superintendent.  They do a lot in just taking

19   care of the ward.  He was an experienced superintendent in the

20   7th Ward.  He wrote in his letter to you that he had years of

21   experience.

22        She was the only alderman in the entire city of Chicago

23   that he ever knew would actually take her staff and go out with

24   her staff and go out and personally try to deal with the crime

25   problem by boarding up vacant buildings over and over again

because those vacant buildings were a hotbed for drugs and prostitution, and she did that not just -- she didn't have to do that to be the alderman in the 7th Ward, but she did it. She did it because she believed that it would help the people in her community.

The Pastor Cannon's tab 8 describes in some detail her continuing effort in those years to spearhead food basket programs, and she'd literally, in her ward, would reach up to 5,000 needy families at Christmas, Thanksgiving, and other holidays.  So I'm not going to belabor the letters.  They're there.  The history's there.

I believe the simple truth is that in her role as the alderman of the 7th Ward that she did -- with leadership and kindness, she did more than required of anyone to be an alderman in the city of Chicago, and her leadership and her dedication and advocacy for the disadvantaged was second to none in the city of Chicago.  And I think that's a proper factor, along with everything else, under 3553 for Your Honor to consider in imposing a sentence of probation.

Another 3553 factor I'll touch upon is specific deterrence.  That's there.  Let me talk about it.  As far as specific deterrence in this case, the fact that she pled guilty, cooperated, had this immediate acceptance of responsibility speaks powerfully of her regret and her remorse for the actions that she took.  She lost -- she lost her reputation in the

community, she's lost her public position, she's lost her

professional standing, but that's small.

I think that's small compared to what Deborah Williams told

you in Tab 12.  She was a family member who told you, and I'm

going to quote that "the pain caused these kids because of her

own misconduct" -- not Jesse's, but hers as a mother, which she

got caught up in this and pled guilty, Ms. Williams wrote to

Your Honor, "what greater reminder about the consequence of

one's action than to have to face your children every day and

reassure them that you are truly sorry, that you will work with

them to gain forgiveness, and that you never want to cause them

that type of hurt and pain or disappointment again in the future."

That is an enormous impact.  So the idea that she has

suffered significantly, there is no chance, no chance at all,

that Sandi Jackson would ever again repeat the failings of

judgment that have caused her to be before Your Honor for

sentencing today.

Now, as far as the nature of who she is, I want to talk

about the children, and I guess it's my primary argument.  The

others are important, but I want to do two things if I could for

just a moment.  I want to first of all, independent of this

case, talk about what she has done as a mother -- nothing to do

with this case -- over the years to be a mother to these

children and what she's contributed to their lives.

But number two, the most important, I want to talk about

the devastating impact it would have to remove her as their

mother in this very formative, critical stage of their lives.

So they're interrelated.  Let me try to do the first one.

As far as caring for her children -- I'm not going to

belabor this, but you can tell from our sentencing submission,

her experience from motherhood was unusual from the start.

Sandi suffered from a series of heartbreaking miscarriages in

the 1990s.  In 1998 they thought they had it, she became

pregnant, she got everything to the sixth month, and then the

day the child was born early and their son died that day.

But she learned a lesson from that, which was that she

learned from the medical community that if she's going to have a

baby, she's got to stay bedridden.  She can't get up.  She's got

to be tied to the bed, and she did it.

In 2000 they had a healthy child, their daughter who's now

13 years old, and that was a nine-month bedrest pregnancy that

she went through so she could bring that girl into this world.

Then she repeated it four years later, in 2004, and gave birth

to their son who's now nine years old.

From the letters that we have submitted to you, you see

the picture of someone that is totally devoted as a mother to

her family.  She had a professional career, and she obviously

did what all of us try to do, try to be great parents and

balance these tensions between family and professional careers

that we chose to follow.

When you read these letters over, there's a school teacher
named Sylvia Thomas, tab 94.  She actually lived in the Jackson
house for two years.  She wrote you in some detail about she
observed Sandi Jackson virtually every day the way she
interacted with these kids -- nothing to do with this case, just
being a mother -- and the way that she would follow a routine
and a ritual to devote herself to those children, to make sure
that they were properly developed, that they had proper support,
that they would acquire self-confidence to take on the issues of
the world, and she did that day in and day out.  That had
nothing to do with this case.  That was just who she was as a
mother.

I noticed also that there were two former chiefs of staff
that talked about what she did to balance these careers.  And
Bonita Parker -- again, tab 1 -- she said, "The truth is that
Sandi Jackson took care of her children's every need at all
times with strength, compassion, grace, and love.  Indeed, Sandi
so effectively balanced her roles as a professional and a mother
that she has become a personal inspiration and role model for me."
That's Sandi Jackson independent of anything to do in this case.

A parent whose children attended the schools that Sandi's
attended wrote you a letter, tab 38, saying she was an
irreplaceable member of the school community and a completely
dedicated mother.  So I just -- I'm not going to belabor it.
This woman was a great mother, independent of this case, nothing

to do with this case.  She was what you want a mother to be, to
raise kids and give them a chance to make it in this world, and
she did it.

Now we come to this case and the devastating effect and
impact it will have on these children if Your Honor should decide
that a prison sentence should be imposed upon her, and I want to
talk about that.  Those two children are now -- the boy's age
nine; the girl's age 13.  They are clearly in their formative
development, critical years as children growing up.

I'm not going to get into a lot of detail, it's discussed
in the submissions, but during the past several months, they've
gone through an extraordinary traumatic experience with the
result of both parents being charged with crimes and both the
mother and father and the fallout that has occurred in their
lives because of that.

Obviously, the events of today naturally have to have an
impact, and they need Sandi Jackson's love, her support, her
nurturing, being a mother.  They need it now in their life and
are going to need it over the next few years.

There's no question that there's a healing process that has
to take place.  Sandi Jackson is the only one that can do that.
She is the mother of these children.  To take the mother away
from them with a prison sentence at this point in time or any
time in the near future would be an unbearable burden on these
two children.

1          Now, the government seems to recognize this.  They say they

2     want to stagger sentences -- and I'm not going to be critical to

3     the government; we've worked very well with them, but the

4     solution they have is totally unworkable.  They told you they

5     want Sandi Jackson to go to jail now first and then Jesse

6     Jackson to follow.  That doesn't give any consideration to the

7     children, because if you take Sandi away now from these

8     children, you've heard Mr. Weingarten describe the debilitating

9     bipolar disorder that Jesse Jackson has experienced over the

10     last several years.

11          The glaring defect in the government's suggestion would be

12     to suggest that Sandi Jackson is not needed as the primary --

13     she's been the primary caregiver for quite some time.  To take

14     her away and remove her at this critical time, at this traumatic

15     event in this family's history, would result in enormous harm to

16     these children.

17          Jesse Jackson loves these children; there's no question

18     about that.  None whatsoever.  But you've heard Jesse himself

19     tell you these kids need to be with their mother to get through

20     this, and it's critically important.

21          Now, you could take the other suggestion, well, why not if

22     she's going to go to prison, put it on the back end after Jesse

23     Jackson is out of prison.  Think about that just for a moment if

24     that happened.  So Sandi Jackson now, if Jesse goes to jail,

25     clearly has to have the strength to rebuild herself and her

life, but she has to be able to get these children, in the most

stable and productive way, to get through what is going to

happen to them over the next period of time.

Yet, think about this:  If she's going to have a prison

sentence imposed today that's going to take place a year and a

half from now or whenever, whenever it occurs, that the

children, knowing that their mother will be ripped out of their

house in a year and a half or whenever that is, what that's

going to create in Sandi's ability to rebuild her life and to

also make sure that her children have the opportunity to be able

to develop and get through all of this would be an extraordinary

burden to carry over the next period of time.

THE COURT:  Well, Mr. Webb, I understand that it is

your position, it is everyone's extremely strong position that

there be no incarceration in this case.  But seems to me you

have just given me the argument for why, if there is, that the

stagger should be in the opposite order of what you suggested

and that she would go first.  You've just given me reasons for

why the other alternative makes no sense.

MR. WEBB:  Your Honor, I've explained -- I'm not

trying to choose between a Hobson choice.  I'm trying to explain

that both of them have very disastrous consequences.  If I had

to choose, I would choose going later, because these kids have

to have her now and I couldn't stand here in good faith and make

that argument to you that they have to have her now.

1          Your Honor, when Jesse goes to prison, as I understand

2     it under federal law, they have an income right now based on

3     disability payments that he's receiving which will be cut

4     significantly because of federal law when he goes to prison.

5     She's already -- because she's got to be at home with the kids,

6     she's already trying to rebuild her life.

7          She's already gone out, and she's got some consulting

8     opportunities that she's developed in order to be able to work

9     at home, but supplement the income, and she's got some very

10    significant opportunities that she's developed on her own in

11    recent times because she's trying to rebuild her life and help

12    her children.  So if she were to go to jail now, that would

13    remove all of that opportunity.

14         But I'm also suggesting to Your Honor that on the back

15    end, if you create that uncertainty that that also would be a

16    tremendous burden to have to carry, and I just thought I should

17    point it out to Your Honor because I don't want to choose

18    between those two and I don't want to ask Sandi Jackson to

19    choose between the two.

20              THE COURT:  But I might have to.

21              MR. WEBB:  And I respect that.  I do.  I respect it,

22    and I just told you my answer.  I mean that she would have to go

23    second -- or I would respectfully ask that you consider that.

24    That's a choice that we don't want to make, but you asked me the

25    question, and I've tried to answer it as directly as I can.

1          So I think the bottom-line conclusion is very clear.

2     The only way to protect the children is to make sure that

3     they're not deprived of the constant and consistent care and

4     love and support that their mother can provide to them and that

5     that should justify a sentence of probation in this case.

6          You have numerous letters that explain how dependent these

7     children are on Sandi and how much they're devoted to her

8     she's devoted to them.  So we're asking you to sentence Sandi to

9     a term of probation to allow her to have a chance, to have a

10    chance to protect and care for these children and be a mother

11    during this critical time period.

12         I recognize the government's argument that, because of the

13    seriousness of the crime, does this satisfy some deterrence

14    purpose, general deterrence.  One thing that I'd like to call to

15    Your Honor's attention, we recently submitted to Your Honor a

16    letter from Kristine Jensen.  She's a development and volunteer

17    coordinator at an organization called Martha's Table.  It's a

18    Washington, D.C., non --

19         THE COURT:  Yes, I'm familiar with the organization

20    and the letter.

21         MR. WEBB:  And I won't say anything more about it.

22    She's willing to supervise a program, if Your Honor should --

23    of community service hours, whatever you should decide is

24    appropriate.  And if you should decide they are appropriate, she

25    is willing to do so, and I wanted point that out to Your Honor.

1          THE COURT:  Thanks.

2          MR. WEBB:  I'm going to conclude; I've talked on long

3    enough.  We believe that a sentence of probation is justified by

4    the 3553 factors, and thank you for listening to me.

5          THE COURT:  Thank you.

6      Ms. Jackson, is there anything you would like to say to the

7    Court?

8          THE DEFENDANT:  Yes, ma'am.  I am a little nervous,

9    so I have a written statement I'd like to read to you.

10      I want to begin by apologizing first to my family, to my

11   friends, my community, and my constituents for my actions that

12   have brought me here today.  I've grieved every day, every

13   single day, over the fact that my mistakes have resulted in my

14   end of service as an alderman.  It's caused disappointment in my

15   community, and it's put my family unit in peril.

16      I stand before you today asking for mercy.  I ask for the

17   chance to continue to provide for my children with the love and

18   nurturing and the guidance that they need.  They'll need

19   stability even more in the months and years to come, and I pray

20   that I can be at their sides to provide it.  This case has taken

21   an enormous toll on me, which is to be expected, but my heart

22   breaks every day with the pain that it's caused my babies.

23      I ask the Court for mercy and to allow me to be the parent

24   and the provider and the support system that my two babies will

25   require in the difficult months ahead.  Thank you.

1          THE COURT:  Thank you.

2      Mr. Graves?

3          MR. GRAVES:  Thank you, Your Honor.

4      Your Honor, I wasn't intending to begin this way, but I

5  think I'll begin the same way that Mr. Webb did and talk about

6  cooperation, in light of the defense presentation.

7      With respect to his reading of our memorandum in aid of

8  sentencing, of course we don't dispute that we said those things

9  or we characterized the defendant's cooperation in any different

10  way here today.  The defendant was incredibly cooperative with

11  the investigation of her, she deserves credit for that, and that

12  is a factor that we considered.

13      The one place in which I'd like to direct the record was

14  Mr. Webb used the term that we were "struggling" along in this

15  investigation, and because defendant directed them to, they

16  resolved this in three to four weeks and helped us as we were

17  bumbling and stumbling about the wilderness.  That's just simply

18  not the case.

19      One can look at the timing of these plea agreements and

20  the fact that the defendant's husband entered his plea agreement

21  approximately two weeks before -- finalized his plea agreement

22  two weeks before the defendant did, in which he admitted to a

23  $750,000 conspiracy, and by implication, the statement of

24  offense identified -- not by name, but by position, title,

25  relationship to the defendant -- his wife as a co-conspirator.

 1    We outlined for defense counsel the documentation we had,

 2    the fact that we'd already documented hundreds of thousands of

 3    dollars in transactions that the defendant was personally

 4    involved with in the campaign by the time that she had come in,

 5    and we were going to investigate more, and we explained to them

 6    that we had witnesses who were going to corroborate the documents

 7    that we had.

 8    The defendant deserves credit for accepting responsibility,

 9    but this wasn't the case of her walking in off the street and

10    just agreeing to something that the government never thought of.

11    And touching on the point that there was this conspiracy

12    plea out there two weeks before -- and I'm going to turn to this

13    when I conclude my comments here today -- the government took

14    all of the arguments that both defendants are making incredibly

15    seriously: the impact on their families, the works that they had

16    done in their lives.

17    I would hope that the Court would recognize, both in terms

18    of the acknowledgements we put in writing in our memorandum in

19    aid of sentencing and the arguments that we're making today,

20    that we don't have a reflexive reaction of "seek the most" for

21    both the defendants, that we have really thought carefully about

22    the §3553 factors, and we don't arrive at the recommendations we

23    don't make lightly, and aren't recognizing the impact,

24    unfortunately, that this could have beyond the two defendants.

25    But from the government's perspective, just like with her

husband, the proper starting point is the seriousness of the

offense, and I think the easiest way of thinking about the

seriousness of Ms. Jackson's offenses is just to forget about

for a moment her husband's illegal conduct.  In fact, forget for

a moment that she's even married to Jesse Jackson, Jr.

The Court is going to consider that when it considers all

of the 3553 factors, but in the context of the seriousness of

the offense, just think about the defendant as Alderman Jane

Doe, a generic alderman, and think about what that generic

alderman has done.

That generic alderman has used $22,000 from her alderman

campaign for personal use.  She used a credit card issued to her

by a federal campaign to pay for over $171,000 of personal

expenses with campaign funds.  She didn't pay taxes on any of

that money.  Prior to becoming an alderman, she served as a

treasurer for a campaign, and she knowingly and intentionally

filed false reports with the FEC regarding the campaign's

expenditures.

While she was serving as an alderman, while she was serving

as a public official, she knowingly and intentionally provided

information to a treasurer of a federal campaign knowing that

the treasurer would incorporate that information into the

campaign's FEC reports and the FEC reports would be false.

Alderman Jane Doe's conduct would be significantly worse

than the alderman in the Pawlinski case who got eight months,

the alderman in the <u>Henningsen</u> case who got 33 months.  And

the conduct I just described doesn't even take into account

that this alderman, when she signed her joint tax returns over

the period of the years covered by the agreement, knew full well

or had reason to know that the tax returns didn't include

approximately $338,000 of proceeds from her husband's illegal

activity.

I submit it's helpful to start that way, because it's easy

in this case, when you look at Ms. Jackson against Mr. Jackson,

to lose sight of what she independently did, her independent

criminal conduct.

There's a notion swirling around the submissions on Mrs.

Jackson's behalf, the memorandum in aid of sentencing and the

letters, that she in some way is another victim of her husband's

crimes; that her crime was only signing these tax returns

knowing that they didn't include her husband's ill-gotten gains;

that at worst, she just made a couple of bad decisions in a

moment of weakness driven by the legitimate stressors that the

government recognizes the defendant has had in her life.

That's just not what the facts show.  The facts show that

she stole.  She stole a lot of money.  And not in a handful of

moments of weakness, but over a period of years.  Examples

include:

2007, over $2300 in expenses associated with a

Walt Disney World vacation;

2008, over $15,000 for appliances at their Chicago home,
including a washer, a dryer, an Electrolux stove, and a subzero
refrigerator;

2009, over $3600 for school fees;

2010, over $1200 at a convenience store.

On top of these examples, we see the defendant repeatedly
between the campaigns using thousands of dollars at salons and
for spa treatments.

The simple fact of the matter is that even if Jesse
Jackson, Jr., didn't steal a dime, Ms. Jackson's case would be
incredibly significant.  To put it another way, but for her
husband's conduct, we would be in here arguing today that her
conduct represents the most serious abuses of the campaign
finance system for personal use that have ever been documented
and prosecuted.

Against this backdrop, from the government's perspective,
it's not only unrealistic but also without justification to ask
for probation.  Not surprisingly, defense counsel hasn't
identified a single case where a defendant similarly situated to
defendant was given probation.

No one disputes the many kind acts in the letters submitted
by Ms. Jackson's supporters, but kind acts in one's personal
life and kind acts even above and beyond in one's professional
life can't take conduct that in every other theft-from-campaign
case resulted in incarceration and turn it into a probation

case.

Now, with respect to the children, there are two arguments that were made.  The first is, independent of what's happening with her husband, Ms. Jackson is a mother who has a special connection to her children, and especially in trying times she shouldn't be taken away from them.

The government submits that there's just no support in the authority that such a broad argument should apply.  There are numerous parents who are sentenced every day in federal courts across this country who are parents and have special connections to their children, and that in and of itself isn't a basis for a probationary sentence.

The second argument is the hardship the children would suffer if their mother is taken away from them while their father is incarcerated.  We recognize that, and that's why we're recommending a staggered sentence.

Now, in terms of the hardship of incarceration for both of them, meaning that one of them shouldn't be incarcerated as Mr. Webb would suggest, we cite a number of cases where courts have said this isn't a reason in and of itself to vary or depart, and I think the best example of that and the sharpest contrast to this case is the Thi case we cite out of the 7th Circuit.

There the defendant was convicted and sentenced facing multiple years of incarceration, her husband was charged and convicted but not yet sentenced given the conduct also,

presumably facing years of incarceration, and they had a three
year-old child.  They didn't have family in the area.  The
daughter was going to have to be relocated to a different part
of the country to live with a grandmother who spoke little
English and was from a different culture.  They were immigrants
from Vietnam, I believe.  The court said this is a heartbreaking
situation, but it is not a basis for a variance or departure.

When you look at the facts there and compare them to the
facts here, the support network that the defendants have around
their family, the government's just hard-pressed to see how this
case can be differentiated than Thi in such a way that a variance
should be given here.  Staggering, yes.  Variance, the government
just doesn't agree.

Ms. Jackson, over the course of approximately six years,
engaged in incredibly serious criminal conduct.  We've spent a
great deal of time at our office, consistent with 18 U.S.C.
3553(a), thinking about what would be a sufficient but not
greater than necessary term of imprisonment in light of the
section's factors, taking first and foremost into consideration
general deterrence, respect for the law, the seriousness of the
offense, and keeping in mind the desire to avoid unwarranted
sentencing disparities.

Those factors all call for a period of substantial
incarceration.  The defendant's acceptance of responsibility,
her cooperation with this investigation, and the good works

she's performed in her personal life justify her receiving the plea that she did, from our perspective.

Through her cooperation and acceptance of responsibility, her guideline range is 18 to 24 months.  That her guideline range of 18 to 24 months is a function of the government crediting, prior to extending a plea agreement, many of the arguments that the defendant is now making for a sentence below the applicable guideline range.

From the government's perspective, while there are merits to those arguments, they can only carry a defendant so far. From our perspective, this conduct, which took place over years, involved the theft of hundreds of thousands of dollars and not paying taxes on any of it, warrants 18 months of incarceration, not probation.  Thank you.

THE COURT:  Thank you.  I'm going to take another recess.  I anticipate that it will take until approximately 12:15.  I can't guarantee that, but I would say that you should be prepared to be back at 12:15 and in your seats, and you may remain seated now.  Thank you.

(Recess from 12:00 p.m. to 12:25 p.m.)

THE DEPUTY CLERK:  Your Honor, recalling criminal case Nos. 13-58 and 13-59, the United States of America v. Jesse L. Jackson, Jr., and the United States of America v. Sandra Stevens Jackson.

THE COURT:  Mr. Jackson, could you come to the lectern

1    with your counsel.   (The defendant complies.)

2        I don't have to tell you that this is a very sad day and a

3    very difficult case.   From what I've gathered from everything

4    that's been presented to me, you are an extremely intelligent,

5    charismatic, inspirational leader who's genuinely committed to

6    improving the lives of individual constituents and to advancing

7    the cause of justice in this country and throughout the world.

8        While you were born into a family that could introduce you

9    to world leaders and provide you with an incredible education,

10   you were also burdened with the mantle of what you've called

11   great expectations, beginning with the moment you were given

12   your name.   Yet you've proved in so many ways that you're

13   someone serious and substantial in your own right and not just

14   somebody junior.

15       You're a complex person with both extraordinary gifts,

16   and your own demons and challenges to be overcome, and you stand

17   before me today because you've admitted that you committed a

18   federal crime.   You stand before me today not just because you

19   violated the law but because you violated the trust of the

20   people of Chicago.

21       How does one go about balancing and addressing all of those

22   circumstances at one time?   As I stated earlier, Congress has a

23   statute that tells judges what they're supposed to consider when

24   they sentence someone, and I find in the end that it is really a

25   perfect and thorough and helpful guide.   So I'm going to consider

1    each of the factors in the statute one by one.

2         The first thing that I'm required to consider is the

3    nature and circumstances in the offense.  This is not in dispute,

4    and I think you summed it up perfectly and very candidly in your

5    own words at the time of your guilty plea when you told Judge

6    Wilkins, "For years I lived in my campaign."  That is certainly

7    the case.

8         You've admitted diverting a significant amount of money --

9    $750,000 -- from your campaign fund over a significant amount of

10   time, from 2005 through 2012, and using it for personal

11   expenditures.  The statement of offense is very long and it's a

12   matter of public record, but I do think it's important to go

13   into some detail this morning about what it says and the extent

14   and scope of what went on, because that conduct is the reason

15   why we're here today.  Money was illegally diverted from the

16   campaign in several ways:

17        First of all, you simply wrote checks, or had them written,

18   to spend campaign funds directly on personal items.  This starts

19   off with $43,000 for a Rolex watch.  $14,000 more was spent in

20   chunks here and there over the years to pay down your family's

21   personal credit cards.

22        Second, you used the campaign credit card to pay for

23   personal expenditures and then have the campaign pay the credit

24   card bills.  You've admitted doing this, or that you and your

25   co-conspirator who we now know to be Sandra Jackson, did this

1    over 3,000 times.

2        The charges range from the pedestrian: trips to Costco for

3    daily household items, dry cleaning, grocery stores, drug stores

4    and car repairs; to the extravagant: charges on a cruise ship,

5    $5,000 at a furrier, $10,000 worth of flat-screen TVs and other

6    electronics at Best Buy, and thousands and thousands of dollars

7    worth of celebrity memorabilia.

8        There may be blurred lines for congressmen to follow when

9    their life is political.  There may be gray areas in campaigns

10   finance.  This case did not come near those areas.  There was

11   $15,000 spent in one day for appliances for your home in Chicago,

12   restaurants and clubs, airfare, gym memberships, tobacco.  There

13   were over $580,000 worth of charges using the campaign credit

14   card, all paid for by the campaign.

15       Third, and this is particularly problematic, you funneled

16   campaign funds to other people so that they could then use the

17   money to purchase things for you and your family.  You directed

18   that checks for thousands of dollars be paid to your wife's

19   consulting business, supposedly for campaign purposes, when she

20   turned around and used those funds to pay personal bills.

21       You paid an individual identified in court pleadings as

22   Person A for doing work for the campaign when the work was

23   worth significantly less than what he or she was paid, and

24   then you directed Person A to spend the rest of the money for

25   you and your wife to pay down your credit card bills or to pay

1    contractors working on your house.

2         You wrote checks to Person A for services he or she had not

3    performed at all, and then Person A simply wrote checks back to

4    you.  Person A was in the middle of the transaction using

5    campaign funds to pay for mounted elks' heads.  Other individuals

6    were roped in the scheme with money funneled through Person C

7    for your children's private school, or Person D again to pay off

8    credit card balances.

9         It is true, when you look at the nature and circumstances

10   of the offense, that there is absolutely no evidence that you

11   ever accepted a bribe or gratuity or that your votes or your

12   legislative service were ever compromised by self-interest in

13   any way.  That's an important fact.

14        The defense memoranda suggested in some ways this was

15   really a crime without a victim and that giving money to your

16   campaign was really the same as giving it to you.  It notes that

17   your donors and creditors are not clamoring for their money back,

18   but I don't really accept that.

19        There are reasons why contributions to campaign

20   accounts fall outside the bribery laws, specifically because

21   they *aren't* gifts to candidates personally, and they are subject

22   to limitations and disclosure obligations because they are

23   different and special and they are part of the democratic

24   process.  They are, as the Supreme Court has told us, speech.

25   They're saying, *I believe in Jesse Jackson, Jr.*

You can go online to the FEC's Web site and see the names
of hundreds of donors even for the last campaign.  They are, in
my view, the victims here.  You had donors who maxed out at
$2500, and plenty under a thousand dollars, and some who gave
you even under a hundred dollars.

Mr. Weingarten said there are no widows and orphans in this
case, but people who describe themselves as housewives and
retirees did not get their checkbooks and write out a $50 check
to you to outfit your home or your wife with luxury items.

There's been some suggestion in some of the letters
submitted as attachments to your sentencing memorandum that
there are mitigating circumstances, that compulsive spending can
be consistent with the mood disorder for which you're now being
treated.

Your team was careful not to directly advance that as a
defense.  Your counsel specifically disavowed any intention to
do that at the first status hearing, and you, to your credit,
have never suggested that anyone or anything is responsible
other than you.

But many speaking on your behalf have sounded that theme,
and your team did append those letters to your pleading.  The
problem is that psychiatrists who advance that theory are not
the ones who are actually treating you, and even they acknowledge
that they were speculating and there's really no way to assess
whether and to what extent it may be the case.

1    I haven't been given enough information about when those

2    periods occurred to know that if any of the large, unnecessary

3    purchases were even made during those times or if they can be

4    tied to your condition.  The defense has not even tried to make

5    that case.

6    But even if one were to grant the possibility that it

7    happens sometimes -- if, for example, the times you dealt with

8    Antiquities of Nevada and spent $5,000 on memorabilia, or you

9    swept through Best Buy and spent $10,000 in one day -- if those

10    were symptomatic of the illness, the manic episodes were just

11    that.  Episodes.

12    The disorder, however real, cannot begin to explain all of

13    the thousands of dollars spent day in and day out, not just on

14    extravagant excess, but on *everything*: furniture for your kids'

15    rooms and household appliances, things that you lived with and

16    used and touched every day.  They were not all sudden or

17    extraordinary purchases.  The spending was constant.  Some of it

18    was for necessities.

19    You and your wife were running up credit card bills you

20    could not pay, and you utilized the campaign fund as a personal

21    piggy bank to help out.  Even if one were to grant that maybe

22    you shouldn't be held accountable for specific episodes of binge

23    spending, you'd end up setting aside only about $50,000 of the

24    $750,000 total.

25    Even if you put aside and excused $100,000, in the end the

mitigating circumstances do not mitigate.  The inescapable fact
is that you and Sandra Jackson used campaign funds to maintain a
lifestyle and a level of expenditure that you could not have
maintained otherwise.

And you didn't just plead guilty to spending the money or
to conspire to participate in the fraudulent scheme to convert
the money.  A critical part of the nature and circumstance of
the offense is that you repeatedly filed false reports with the
Federal Election Commission and the House of Representatives,
and as you pointed out, those be reports aren't just for
somebody in an agency with a green eyeshade.  They're for the
press and ultimately for the public.

You and Sandra Jackson directed others to omit these
expenses from federal filings or to submit false justifications
for the expenditures that you did list, and you selfishly placed
those people at risk and in jeopardy.  These actions make it
impossible to chalk up any of this to a periodic loss of control
or to confusion about how the credit cards or accounts could be
used.

You are not an old-timer who used to be around in the '80s
when the rules were different.  This was a knowing, organized,
joint misconduct that was repeated and then covered up over a
period of years.  It means that the many beautiful letters that
ask me not to define you by your "one mistake" or your admitted
indiscretion, moment of despair or once-in-a-lifetime mistake in

judgment are disconnected from and do not really address what
happened here.

But what you did is only part of the calculation.
The statute also directs me to consider who you are.  I'm told I
must consider the history and characteristics of the defendant,
and this is obviously a much more positive picture.  In reading
the letters that have been submitted to me, I've had the chance
to learn so much about you.

People write about your character and your compassion,
your ability to relate to people from all walks of life and
of different economic and social circumstances.  You have a
divinity degree, a law degree, a business degree, and you've
taken all that education and poured it into doing good for your
community in a way that is thoughtful, innovative, and committed
to the needs of your constituents and to the needs of the world
at large.

But that's a double-edged sword, because even a quick
review of your resume and the fact that, as Mr. Weingarten said,
you were under a microscope your whole life, points to only one
conclusion, and that is that you knew better.

On the positive side of the ledger, though, many people
wrote to detail your efforts on behalf of the Chicago Public
Schools, your commitment to quality education and job creation.
You did what no one else had done before and made sure that the
people of Ford Heights had clean, safe water to drink and to

bathe with.  The government said to me you can't give him credit
for his public service; that was his job.  But we all know that
there are different ways that one can do one's job, and not
everyone on Capitol Hill actually gets anything done.

You are a member of Congress who never missed a vote in
13 years.  The people drinking water from corroded pipes were
not living in some far-off country; they were living in
Illinois, and no one bothered to help them before.  Not everyone
uses their position to lift up those who need it the most.

It says something when a member's colleagues are willing to
come forward and align themselves with him, even after he fell,
to extoll the quality of his service.  I received many letters
from the Hill.  You supported legislation that placed the statue
of Rosa Parks in the Capitol, and increase the minimum wage, the
expanded medical research into the important issues surrounding
minority health and health disparities.

You stood on a House floor in May of 2012 and gave a
stirring speech to defend the Voting Rights Act from threatened
evisceration.  You worked hard to bring airport construction
jobs to the people on the South Side of Chicago.  You stepped
back to look at social issues and human rights in a systematic
way, writing an influential book called *A More Perfect Union.*

And you've done your best to help individual people, one
person at a time.  I received letter after letter that talks
about how you got involved in a personal way, calling banks

yourself to aid people facing foreclosure, or people with serious medical issues and medical bills, and I've read accounts of small acts of kindness done at the most important time: when nobody was looking.

I think constituent service isn't necessarily a part of the job, and the way you went about it is telling.  I don't accept the notion that you did it just so you could keep the job and keep the campaign money flowing.  I think that is a level of cynicism that doesn't really apply in this case.

It's true that you were born into a household where politics and activism and justice were your daily bread and that your pedigree may have fueled your political ambition and helped launch your career.

Certainly you started with a leg up, with name recognition and support that others only dream about, but that doesn't mean you don't deserve credit for what you've done.  You could have walked away from that legacy.  You could have done it in a half-baked way.  But instead you did the hard work yourself, and you have a record of real diligence and dedication and commitment.

That's what makes this situation so tragic and what makes this decision so difficult.  There are constituents who have written to me and urged me to uphold the rule of law and throw the book at you.  There are others, and many friends and family members, who have cajoled me to be lenient, emphasizing that while you are guilty of bad acts, you are not a bad man.

1    As I struggle with this, I realize that ultimately, as you

2  well know, I am not the one who sits in judgment of you as a

3  man.  It came as somewhat of a relief when I remembered that.

4  You've lived just one portion of your life before today, and

5  you'll live even more of it after.  I have the limited role of

6  imposing sentence in response to a specific set of acts.  That

7  must be done in the context of who you are and how you live the

8  rest of your life, but it is not the final judgment on who you

9  are as a man.  As your counsel said, there will be another

10  chapter here.

11    Getting back then to the context for your actions, the

12  government objected to the emphasis placed in the sentencing

13  memorandum on your mental health and your family's circumstances.

14  They point out that the sentencing guidelines rule these things

15  out as grounds for departure except in extraordinary

16  circumstances, and they note that you're not asking for a

17  departure.

18    But that doesn't mean I can't think about them.  I *have* to

19  think about them because the sentencing statute specifically

20  requires me to consider your history and characteristics, and if

21  that wasn't a sentencing factor, then all the government's

22  arguments about your education and your advantages and your

23  income would not be relevant either.

24    I don't think there's any dispute that you suffer from a

25  condition that's real and that it can be completely

1    debilitating, and your family and friends have recounted

2    episodes of extraordinary pain and difficulty.  I don't know how

3    often they occur, how long they've been going on, or how long

4    they last.  The condition seems to be managed principally with

5    medication, but you also appear to require ongoing therapy for

6    which a trusting relationship is a necessary foundation.

7         But I do have to agree with the government that the

8    information that was provided to me concerning your mental

9    health issues is somewhat thin, and it doesn't give me a lot of

10   guidance about what to do about it.  There was little provided

11   about the actual diagnosis, how it presents in your case and

12   what's needed now to address it.  Some of the depression and

13   stress has been directly related to the fear of exposure and the

14   public disgrace and the pendency of this case.

15        I can't distill from the mix how much, and I don't know

16   whether or not some of the stress will finally abate once today

17   is behind us.  I can say that I haven't been given anything that

18   would demonstrate that the services you need cannot be delivered

19   in a structured setting or that separating from your current

20   therapist to a new therapist would be devastating.

21        In fact, I've been provided with information that shows

22   that you've already had a succession of treatment facilities.

23   But your need for ongoing treatment, what it would cost the

24   taxpayers, how to deliver that treatment, and where and how it

25   can best be provided are all factors that go into the decision

1    of whether a sentence within the guidelines range is appropriate

2    or necessary.

3        Finally, within the category of the history and

4    characteristics of the defendant, your acceptance of

5    responsibility is another positive factor here, and it could

6    provide grounds to vary from the guidelines.  In any case where

7    an individual pleads guilty, he gets the reduction of two or

8    three levels prescribed by the guidelines, but the government's

9    told me that this case is special, that you went above and beyond.

10       You were the one who initiated the conversation with the

11   prosecution, and you came in early.  Your cooperation was

12   substantial, helpful, candid and complete, and you saved the

13   government significant time and effort that it would have spent

14   unraveling this case.  I appreciate the prosecutor's candor on

15   this point, and it's an important factor to be considered in the

16   ultimate sentence in this case.

17       The next thing the statute tells me is I'm required to

18   impose a sentence that is sufficient but not greater than

19   necessary to accomplish the purposes that are set out in the

20   statute.  Therefore, another factor I am required to consider is

21   the need for the sentence imposed to do a number of things:

22       To reflect the seriousness of the offense, to promote

23   respect for the law and to provide just punishment for the

24   offense, to afford adequate deterrence to criminal conduct,

25   to protect the public from further crimes of the defendant, and

to provide the defendant with needed educational, vocational

training, medical care, or other correctional treatment in the

most effective manner.

Taking those objectives in reverse order, you're in need of

medical treatment.  The government has demonstrated that it can

be provided through the Bureau of Prisons, but I think we can

also take into consideration that beyond a certain point, ongoing

mental health care, and frankly the cost of incarceration itself,

could be a financial burden on the taxpayers and that the care

might not be at the level or frequency and quality as if received

at home under the care of a trusted therapist.

I don't think there's a need to protect the public here.

That's not a factor in this case.

With respect to deterrence, that concept embraces several

things.  First we have to deter this defendant from committing

another offense.  I believe that given the consequences you've

already suffered and the real remorse you've shown -- it's

palpable in this courtroom and it leaped off the page of your

plea, not to mention the fact that you've given up your

congressional seat and you no longer have a campaign fund --

I think all of that indicates that no further criminal conduct

is likely.

But deterrence also involves deterring others, and it's

important to remind others in high positions that these specific

types of offenses will not go unnoticed.  You said it yourself.

You said, "I am the example for the whole Congress."  It's also important to demonstrate more generally to everyone, particularly to the young people who grew up looking at Jesse Jackson, Jr., and seeing his face on campaign posters and billboards in Chicago, that the law applies to everyone.

Which brings me to the need for just punishment, the need for the sentence to reflect the seriousness of the offense, and to promote respect for the law, which is a factor of heightened importance in this case.

At the time of this offense, you were not just Jesse L. Jackson, Jr.  You were Congressman Jackson, the elected representative of the people of the 2nd District of the state of Illinois.  You may say -- and you haven't, but other people have -- that you shouldn't treat me more harshly than others just because I'm famous and I'm a public official.  And there is some truth to that.

But as a public official, you're supposed to live up to a higher standard of ethics and integrity, and that's not unfair. You chose that role for yourself.  After holding yourself out year ever year and asking the public to name *you* to a position of awesome power and leadership and responsibility, to trust *you*, you are a symbol.  You owe them, at the very least, scrupulous adherence to federal law, and that's really just a minimum, because the ethical standard has got to be much higher than simply "unindicted."

The public is already sadly cynical about the integrity of its public officials and the role that money plays in the electoral process, and your conduct stained not only your reputation but the way in which all elected officials are viewed.  The government is correct when it says that a sentence is needed here to maintain confidence in the system.  A lot of money from contributors flows to candidates' coffers.

One could argue that because of how high you flew you've already lost so much, your seat in Congress and your good name, and so little additional punishment is necessary.  There's no question that you've suffered.  Your remorse is real, as I said before, and that fact that you have already endured considerable punishment is one reason to vary somewhat from the guidelines.

A number of letter writers, most notably your father, wrote to say that you would be better served under supervision and probation among troubled youths rather than locked away, but this part of the statute says it's not about how *you* would be served.  How would I explain a probationary sentence to those troubled youths who are locked up, who didn't start where you started, and were not given what you were given?

If I imposed a sentence that included no incarceration at all in this case, what message would that send?  It would be read one way and one way only, as a clear statement that there are two systems of justice: one for the well-connected and one for everyone else.  I cannot do it.  I will not do it.

I do not know you personally, and I did not even get to take the plea in this case.  But your voice has come through loud and clear, and I believe that you fully understand that a sentence of probation would not be the right thing to do in your case.

The statute tells me I have to consider the kinds of sentences available and the need to avoid unwarranted disparities among the defendants with similar records who have been found guilty of similar conduct.  The sentencing guidelines largely serve that purpose, but they don't uniformly give the right answer.

Sometimes a significant weight the guidelines places on a single element, like the amount of a loss, leads to an unjust result because basing the sentence on the value of, let's say, a government contract unfairly inflates a single act.  But here, basing the sentence on the value of the loss is proportionate to the offense because the offense occurred over and over and over again.

So the guidelines are an important benchmark here.  But I'm required by law to impose a sentence that is sufficient but not greater than necessary to fulfill all these purposes, and I'm required to consider a host of factors which point in different directions.  So in the end, I conclude that a sentence within the advisory guideline range would be excessive in this case.

There must be a level of punishment, but given what the

1    defendant could contribute to the community from the community,

2    there will come a point where continued incarceration,

3    particularly given how expensive it is, begins to have

4    diminishing returns.  I can also take into consideration the

5    fact that it is not most cost-effective and it is not the most

6    medically appropriate way to deliver the mental health care that

7    this defendant needs.

8        Therefore, in an exercise of my discretion, after

9    consideration of all the statutory factors, the sentence to be

10    imposed in this case is as follows:

11        It is the judgment of the Court that you, Jesse L. Jackson,

12    Jr., are hereby committed to the custody of Bureau of Prisons

13    for a term of 30 months on Count 1.

14        The Court recommends that the Bureau of Prisons designate a

15    federal prison camp as the facility at which you would serve the

16    sentence; in particular, the federal prison camp in Montgomery,

17    Alabama, or if not, the closest camp to the District of

18    Columbia.  In the event the defendant is assigned to a federal

19    correctional institution, I recommend that he be assigned to FCI

20    Butner-Low in Butner, North Carolina.  You are further sentenced

21    to serve a three-year, or 36-month, term of supervised release.

22        I find that you do not have the ability to pay a fine, and

23    therefore I waive imposition of the fine.  You are, though,

24    required to pay a $100 special assessment.  The special

25    assessment is immediately payable to the Clerk of the Court for

the U.S. District Court for the District of Columbia.  In the event that is not paid today, you shall make payments on the special assessment through your participation in the Bureau of Prisons' Inmate Financial Responsibility Program.

I find by clear and convincing evidence you are not likely to flee or pose a danger to the safety of any other person or the community if you are released pending the designation of a facility in the execution of this sentence.

While you are awaiting assignment of a date to report, though, it is a condition of your release that you remain under the care of your current mental health professional, see that individual on a regular weekly basis, comply with any medical treatment prescribed, and avoid the use of alcohol.  I will address the question of the particular date for you to report at a later point in these proceedings.

Within 72 hours of your release from custody, you shall report in person to the probation office in the district to which you are released.  While on supervision, you shall not possess a firearm or other dangerous weapon, you shall not use or possess an illegal controlled substance, and you shall not commit any other federal, state, or local crime.

You shall also abide by other conditions of supervision adopted by the U.S. Probation Office, as well as the following special conditions:  Pursuant to 48 U.S. Code § 14135a, for all felony offenses I'm required to order you to submit to the

collection and use of DNA identification information while

incarcerated in the Bureau of Prisons or at the direction of the

U.S. Probation Office.

It will be a condition of your supervised release that you

participate in mental health treatment, which may include

outpatient counseling or residential placement, as approved and

directed by the probation office.

Many people who wrote me took the position that you could

do more good for the community if you were released than if you

were incarcerated.  That is one of the reasons that I am

imposing a sentence that varies from the advisory sentencing

guideline range.  Your mother in particular wrote eloquently

about what she called restorative sentencing.  But that means

that you will be required, as a condition of your supervised

release, to make a significant commitment to the community as

part of your sentence in this case.

Therefore, you are ordered to perform 500 hours of

community service as a condition of your supervised release.

This service may not be political activity, and it must be

performed to benefit disadvantaged individuals under the

auspices of an independent, established, philanthropic,

religious, or social service organization that is not in any way

affiliated with or managed by anyone related to you.  To ensure

that my intentions are carried out, the probation department

must approve both the organization and the nature of the service

1    involved.

2        You shall provide the probation office with your income tax

3    returns, authorization for release of credit information, and

4    information about any business or finances in which you have a

5    control or interest until the forfeiture order has been

6    satisfied.

7        The probation office shall release the presentence

8    investigation report to all appropriate agencies in order to

9    execute this sentence.  Treatment agencies shall return the

10   presentence report to the probation office upon the defendant's

11   completion or termination from treatment.

12       Mr. Jackson, I'm required to inform you that you have a

13   right to appeal a sentence imposed by this court if the period

14   of imprisonment is longer than the statutory maximum or the

15   sentence departs upward from the applicable sentencing guideline

16   range.  If you choose to appeal, you must file any appeal within

17   14 days after the Court enters judgment.  If you're unable to

18   afford the cost of appeal, you may request permission from the

19   Court to file an appeal without cost to you.

20       Is there anything further with respect to the sentence at

21   this time, Mr. Weingarten?

22           MR. WEINGARTEN:  No, Your Honor.

23           THE COURT:  All right.  I'd like to go on directly to

24   Mrs. Jackson's sentence.  (Defendant approaches the lectern.)

25       Ms. Jackson, I'm not going to leave you standing here in

1    suspense.  As you know, I talk a lot.  I'm going to tell you

2    right up front that I'm not going to do what you're asking me to

3    do, but I'm not going to do what the government's asking me to

4    do either.  But I really do need to take some time to tell you

5    why and to tell everyone who took the time and trouble to write

6    to me why.

7         The same statute that I described earlier governs your case

8    as well, and under 18 U.S.C. § 3553(a), I have to consider every

9    single one of those factors in your case separately and

10   individually.

11        First, I have to consider the nature and circumstances of

12   the offense.  You've pled guilty to failing to report the

13   family's significant extra income on your income tax returns,

14   but the statement of offense says very little about the tax

15   filings.  What you have admitted to is a detailed statement of

16   offense that is almost identical to the one underlying your

17   husband's conviction for conspiracy and fraud.

18        I'm not going to repeat everything I just said about the

19   ongoing use of campaign funds for your benefit and your

20   husband's benefit.  The charges I detailed earlier include, for

21   instance, a charge of $3500 for one day's shopping at a boutique

22   for clothes for you; $5,000 worth of fur capes and parkas in one

23   day; family gym memberships.

24        The consideration of this statutory factor requires me to

25   highlight your personal role in these events as well as just

your enjoyment of items that your husband may have purchased, because this is not a case where a spouse passively received the other spouse's ill-gotten gains and therefore the joint tax return was understated and you're both liable.

You are standing here today to be sentenced because of your own significant and repeated involvement in the illegal conduct and the falsifications that brought the unreported income into your checking account in the first place. It is true that you were not the congressman. The way that these two pleas have been structured reflect that fact and that in the end, as the elected official, he was the one who was obligated to maintain the integrity of the campaign fund and the campaign filings.

But when we consider the nature and circumstances of the offense, a critical fact worth knowing is that you were not simply a congressional spouse. You were a key player in the Jesse Jackson for Congress campaign. Indeed, together you were the campaign. From January 2005 to November 2006, you were the treasurer of the re-election campaign. From 2008 on, you were a paid consultant to the campaign, earning $60,000 a year, which isn't even part of this offense, and in 2011 you were the campaign manager.

There were over $580,000 worth of personal charges in over 3,000 transactions charged to the campaign, using its credit cards. One of those credit cards was in your name, and over $170,000 worth of the thousands of personal charges that should

never have been charged were made by you on that card.

It's true another $400,000 worth were made on your husband's card, but many of those purchases were made when you were shopping together at stores you frequented, they were things for you, or they were purchased for the house for which you signed as the person who had received them when they were delivered.

Your sentencing memo points out that Mr. Jackson has admitted that there are about $70,000 worth of those charges on the campaign credit card for his own personal benefit -- dinners, drinks, and cigars -- that you knew nothing about, and that is true, and you're not responsible for them.

But the focus on that number underscores your connection with the remaining $330,000, and it misses the larger point which is that whether or not you two knew about a particular individual purchase that the other made, you had a common, consistent method of funding your lifestyle through these means.

There were $15,000 worth of appliances delivered to your home in Chicago -- a washer, dryer, a range, a refrigerator -- and for years you were the one living in the house in Chicago during the week, at least during the school year, while your family was living in D.C.  $10,000 worth of flat-screen TVs and DVD players were delivered to your home in the District of Columbia.  If any of this was attributable to compulsive or binge spending by your husband, no one has given me any

1    indication that anyone ever tried to take any of it back.

2         As I discussed before, there was money funneled from the

3    campaign using means other than simply the credit cards.  There

4    were checks written from the campaign to your consulting firm,

5    Donatella, supposedly for campaign-related expenses, and you

6    simply transferred the money to a personal joint account and

7    used it to pay down other bills.  There was $36,000 used for

8    that purpose.

9         While you were not behind the purchase of the elk's head,

10   and you were probably distressed about the purchase of the elk's

11   head, you were involved in giving Person A the detailed

12   instructions about their transfer and sale, ensuring that the

13   proceeds ended up in Mr. Jackson's personal account even though

14   it was the campaign that had paid for the items.

15        These unlawful expenditures were compounded by a pattern of

16   false filings to the FEC and the House of Representatives.  The

17   statement of offense specifically states that you, and not just

18   your husband, directed Person A not to itemize the personal

19   expenditures made with the credit cards on the required filings.

20   You have admitted that you, and not just your husband, gave that

21   person false explanations for the expenditures to write on the

22   forms.

23        So the facts demonstrate that you personally, knowingly,

24   and actively participated in the conspiracy to convert the

25   Jesse Jackson, Jr., campaign funds to your family's personal

1      use.  This is something for which you fully share the blame.

2             If there's any doubt about that issue, it would evaporate

3      when we come to the fact that you used your campaign fund as a

4      Chicago alderman in the same way.  $22,000 of money that Chicago

5      residents thought they were donating to your campaign went to

6      $5,000 worth of bedding, $1,000 at a spa in Las Vegas, another

7      $700 charge in Las Vegas in shoes; leaving used funds from the

8      7th Ward Independent Political Organization, a constituent

9      service group that thought it was helping you and your campaign,

10     for personal items.

11            There are no mitigating factors here.  There's no suggestion

12     that you were compromised by illness, and even your need to

13     shoulder the burden of your husband's illness has really nothing

14     to do with this conduct which took place day in and day out for

15     six years.  This is no explanation.  There's no justification.

16     There was certainly no mistake.

17            So while many of the letters written to me seeking lenience

18     are helpful in terms of the information that they gave me about

19     you and who you are, the suggestions that you "made a mistake,"

20     "had a lapse of judgment," or that you were "guilty of being too

21     committed to your family" do not fit the facts.  And I was

22     disappointed to see that the defense sentencing memorandum, which

23     went into such exquisite detail about your life story, did not

24     grapple seriously with the facts at all.

25            On the positive side, as the government made a point of

telling me, you came in and you agreed that you did all of it.
You spared the prosecution the time and trouble of figuring it
all out, you stood up, you took responsibility, and you were
honest and you were forthcoming in your dealings with the
government.  You didn't try to hedge or shade or deny.

And you've been given significant credit for that already,
not just in the three-level adjustment for acceptance of
responsibility but in the deal that was struck, the plea to the
tax count with the lower level of exposure than conspiracy, and
the agreement to cap the loss at $168,000.

The government tells me, See, we've already taken the
acceptance of responsibility into consideration, Judge; you
don't have to worry about it anymore.  But especially after
Booker, it is the sentencing statute that controls and not the
charging decision, and I am supposed to take all of these things
into consideration.  So the quality and timing of your
cooperation can be a reason that supports varying from the
guideline range in your case.

The next thing that I'm supposed to consider is the history
and characteristics of the defendant: who you are.  There's a
different, more positive story.  There's so much more to you
than this case.  You are a woman of intelligence, grace, and
great accomplishment, and the fact that there are so many people
who love you and who wrote to tell me why speaks volumes about
you.  You're a college graduate and a law school graduate, and

1    you didn't have the ramp-up to that that your husband did.

2        You've worked for a number of candidates and campaigns,

3    from the local to the presidential level.  You've not been

4    content to simply support your husband's political and community

5    work, but you entered the fray yourself and you took on what's

6    really a thankless responsibility, which is local government.

7        The letters from the people in the 7th Ward all speak to

8    the personal attention you pay your constituents as individuals,

9    your open-door policy, as well as your efforts to bring

10   development projects to the area that could raise up the

11   community as a whole.  A key initiative for which you deserve

12   credit involved bringing together business owners, community

13   leaders, and residents to confront issues facing the wards

14   together.  But you were willing to pitch in and just pick up

15   trash on the streets as well, and to board up buildings.

16       As far as I can tell, you bring enormous charisma,

17   commitment, and energy to your job, and you had to be incredibly

18   effective and organized to pull all that off while also flying

19   back and forth to D.C. to raise two children and to meet the

20   demands of being a congressional wife in a family that was

21   always in the spotlight.

22       But all these circumstances cut both ways.  As a lawyer,

23   and not just a lawyer but a political operative who worked on

24   multiple campaigns long before you got involved in your

25   husband's or your own, and as someone who moves in the highest

1    echelons of political power, you knew what you were doing, and

2    you knew what you were doing was wrong.

3        I do think it is fair when we talk about the characteristics

4    of the defendant to say that Mrs. Jackson has suffered a great

5    deal in the struggle to understand and cope with her husband's

6    illness.  This is something that other people may not fully

7    appreciate, and it requires a lot of courage and endurance and

8    character.  It's part of the picture as well.

9        I've taken the positive things you've done and the things

10   you could do if you remained in the community into consideration,

11   but that's not what the defense has elected to really emphasize

12   in the sentencing presentation.

13       The thrust of the sentencing memorandum, the overwhelming

14   majority of the letters attached to the sentencing memorandum,

15   the allocution this morning, and the response to the government's

16   sentencing memorandum is that the only appropriate sentence in

17   this case would be a sentence of probation, primarily for one

18   reason: because you are the mother of two children.  A very

19   devoted mother.  The message has not been subtle.  The pleadings

20   have laid this on very, very thick.

21       I don't want to say anything that could be seen as

22   minimizing the importance of that role and that relationship.

23   As the materials I have been given explain in great detail,

24   these children were very much wanted, and they are deeply loved.

25   That is a beautiful thing.

1    I'm quite familiar with the level of daily involvement and

2   management involved in bringing up any children and also how

3   that can multiply exponentially if one encounters any educational

4   or developmental needs along the way.  I don't doubt one word of

5   what I've been told about your devotion to your children and the

6   care with which you are raising them.  It is so admirable.  It

7   is real.  But it cannot be the singular factor that drives the

8   entire sentencing calculus.

9    When the sentencing memo quotes at length from an effusive

10  letter written by your child's teacher who lived with you for

11  two years, describing the routine you follow to gently awaken

12  your children in the morning, it reinforces what is already

13  plain: that you love your children.

14   But it's so far afield from the particular task that I have

15  before me, I really don't know what I'm supposed to do with it

16  or how I'm supposed to factor it in.  And even your attorney

17  kind of said, I want to talk about something that has nothing to

18  do with the case, and that's when he talked about it.

19   What struck me in the end was that the tone of the whole

20  presentation was designed to make an emphatic statement about

21  what the Court's actions would do to these children.  When the

22  government proposed to ease the situation by staggering the two

23  sentences, the response was very sharp: The government doesn't

24  get it.  The suggestion that Mrs. Jackson should go to jail at

25  all is patently unreasonable, and the government is ignoring the

1    children's needs.

2        I would have deeply preferred not to have to make this

3    explicit this morning, but the defense approach leaves me no

4    choice but to say straight out, it is not the Court that put

5    your children in this position.  It is not the government that

6    put your children in this position.

7        The defendant's reply memorandum says, "Mrs. Jackson has

8    always made her children her first priority."  It insists that

9    I must acknowledge your unquestionable prioritization of the

10   health and well-being of your children above anything and

11   everything else, including your own needs.  I don't know.

12   That's obviously true in so many ways, but when one considers

13   all of the facts set forth in the statement of offense, there

14   were many times when that just was not the case.

15       The defense asks me to recognize the *fact* that Mrs. Jackson

16   must remain in the community to minster to her two children and

17   to ease the pain that they're suffering and they *will* suffer in

18   the future, but there's a difference between argument, even

19   passionate, firmly-believed argument, and fact.

20       Of course this has been an extremely difficult period for

21   these children, and it's going to be more difficult before it's

22   over.  But there's been no submission from any expert or any

23   evidentiary foundation for the proposition that they will be

24   irreversibly harmed if you serve some time in prison, as some

25   other relatives who wrote suggest.  They will not, as Mr. Webb

said, "lose their mother."

These children have two parents.  They grew up surrounded by love and support.  They have loving extended families on both sides.  The letters recount even very recent occasions when they were both very actively and happily involved in the activities and lives at their school, they have access to sophisticated and compassionate professional support, and I am confident that you and your husband and your family will do everything in your power to enable them to endure whatever it is they are required to endure.

I don't know that they are more or less resilient than other children or what it will take to maintain their stability while you're away and to restore a sense of normalcy when you return, but I imagine and I hope that you and your family have been working towards those goals every day since the day you entered your pleas.  Accepting the prospect that even *you* might be obliged to serve a sentence is part of acceptance of responsibility.

And when we talk about facts, the fact is that unfortunately this court and courts across the country are often placed in the uncomfortable position of incarcerating parents.  Loving parents. It is always sad, but it is survivable, and you will return to be there for them for a very, very long time, a much longer time than you will be away from them.

Talking about the sentence in the context of other

sentences brings me to the next factor.  As I pointed out

earlier, I am required by law to impose a sentence that is

sufficient but not greater than necessary to accomplish a lot of

purposes, to reflect the seriousness of the offense, to promote

respect for the law, to provide just punishment, deterrence, to

protect the public, to provide you with needed educational or

vocational training.  I'm also supposed to think about the need

to avoid unwarranted sentencing disparities with defendants with

similar records who have been found guilty of similar conduct.

Clearly, you're not a danger to society.  Protecting the

public and the need for correctional treatment are not factors

here, and the fact that they are not supports the imposition of

a sentence below the guideline range.  The fact that you could

accomplish considerable good in the community is also a reason

that a lower sentence would be appropriate.  But I have to

consider the other aspects of this situation as well: promoting

respect for the law, and just punishment.

As has been pointed out this morning, you were a couple

with all the advantages: education, charm, power, and the means

to provide for your beautiful family.  You were a public

official in your own right, and you violated that public trust

not because of something someone else did but by your own actions.

As I stated before, I can't hold you to a lower standard

than ordinary citizens, and arguably you should be held to a

higher standard.  But at the very least, I have to treat you

like everyone else, and many, many parents facing a criminal

sentence deeply love their children.  The illegal aliens who

return to this country, who I have no choice but to separate

from their families and send back to El Salvador, deeply love

their children; that's why they came.

What kind of message would it send to people of your ward

if their elected leader committed a felony but did not have to

serve any time at all?  You spent their money.  On yourself.

The reaction would not be, She has suffered enough; her children

need her.  It would be, The system is unfair, and only the

people with connections get the breaks.

You held yourself out as a leader and as an example.  You

did not live up to that promise, and so today you have to be

held out as an example as well.

The law requires me to avoid unwarranted sentencing

disparities.  We know that the guidelines would recommend and

that the defendants charged with similar schemes often serve

some period of incarceration.  I remind you that when you

accepted this plea agreement, you agreed in writing that a

sentence in the guideline range would be reasonable in your

case.

Is this family so much more needy and so much more

deserving of the dispensation that is being requested to justify

disparity?  If anything, they have access to a better, stronger

safety net of family members, good schools and skilled therapists,

and a significantly better chance of managing the separation in

a healthy way than many others.  But having said all that, the

statute calls for "just" punishment and not "gratuitous"

punishment.  I believe you are sincere when you tell me you have

suffered greatly already.  It's all over your face.

So, for all the reasons I've talked about this morning,

I am of the view that the length of the sentence prescribed by

the advisory guidelines is greater than necessary to serve all

of these goals.  In an exercise of my discretion and after

consideration of all the statutory factors, the sentence to be

imposed is as follows:

It is the judgment of this court that you, Sandra Jackson,

are hereby committed to the custody of the Bureau of Prisons for

a term of 12 months on Count 1.  The sentence is not a year and

a day.  I note for the record that I would have imposed the same

sentence even if I had ruled that the two-level adjustment for

failure to report income from criminal activity did not apply.

I will recommend that this sentence be served at the

facility that is closest to the District of Columbia.  That

hasn't been requested of me, but I assume that that is your

request.  If not, please tell me if there's something else.

MR. WEBB:  Your Honor, in looking at the facilities

available for a women's camp, in talking to various people and

talking to my client, there's a women's prison camp in a place

called Marianna, Florida.  Based on advice I have received and

1    talked to my client about, we would like to request that

2    designation.

3            THE COURT:  As opposed to the closest facility to the

4    District of Columbia.

5            MR. WEBB:  Yes.

6            THE COURT:  I will make the recommendation -- I'm not

7    in charge of the Bureau of Prisons -- that you be designated to

8    that facility, and if not, the closest facility to the District

9    of Columbia.  You are further sentenced to serve a 12-month term

10   of supervised release.

11       I will find that you do not have the ability to pay a fine

12   and therefore waive the imposition of a fine.  With respect to

13   restitution, it's something that you agreed to pay as a term of

14   your plea agreement, but I have discretion in the matter.  It is

15   clear that the family is doing its best to pay the $750,000 that

16   was taken from the Jesse Jackson, Jr., campaign and pay it back.

17       Therefore, I will order you to pay restitution in the

18   amount of $22,000, which is approximately the amount that was

19   taken from your own campaign and which is not included in the

20   calculus of what Mr. Jackson is working on behalf of both of you

21   to pay back.

22       Restitution payments shall be made to the Clerk of the

23   Court for the District of Columbia for disbursement to the

24   victim, IRS-RACS, Attention: Mail Stop 6261, Restitution,

25   333 West Pershing Avenue, Kansas City, Missouri 64108.

1           You are also required to pay a $100 special assessment.

2     It's immediately payable to the Clerk of the Court for the

3     U.S. District Court for the District of Columbia, and if you

4     haven't paid it today, while incarcerated you shall make

5     payments on the special assessment through your participation in

6     the Bureau of Prisons' Inmate Financial Responsibility Program.

7           I find by clear and convincing evidence that you are not

8     likely to flee or pose a danger to the safety of any person in

9     the community if you're released pending the designation of a

10    facility and the execution of your sentence.

11          I further find, and I deeply believe, that it is in the

12    interest of justice and that it will not increase the risk of

13    flight or pose a danger to the community to stagger the two

14    sentences that have been imposed this morning, but I'm very

15    concerned about what the right way to do this is.  I'm not

16    confident that it makes sense to delay this defendant's sentence

17    for the period of time that the codefendant has been ordered to

18    serve.

19          I understand that the family's economic needs may require

20    him to go first and for her to work during that period of time,

21    but you've also asked me to delay his reporting date so that he

22    can meet the family's economic needs.  I'm also concerned, and I

23    don't really understand how it could ease the trauma that we're

24    talking about with the children to have it hanging over their

25    heads for almost three years and have the denouement of this be

1    put off into the future.

2         I feel -- the way I look at it is that it makes the most

3    sense for Mrs. Jackson to serve her sentence first, to come out,

4    to begin to work with the kids; for Mr. Jackson to have that

5    time to continue his mental health care, to stabilize himself to

6    prepare for the incarceration.  So I was inclined -- to me it

7    made more sense to do it the other way around, but I believe

8    that this is something that the family knows best, what is going

9    to work best for the two of you, and I'm willing to defer to the

10   family's choices.

11        Therefore, I'm going to reserve ruling on the issue of who

12   goes first.  At the end of this matter, I'm going to take a

13   recess because you've never discussed it with the actual

14   sentences before you.  You've always discussed it within the

15   context of seeking probation for Sandra.  So I would like you

16   all to have an opportunity to talk among yourselves, and then

17   I will come back and ask you if you have a preference as to who

18   would serve their sentence first.  At that point I will talk

19   about what will be said in the judgment and commitment order

20   about that.

21        Mrs. Jackson, within 72 hours of release from custody, you

22   are going to report in person to the probation office in the

23   district to which you're released.  While on supervision, you

24   shall not possess a firearm or other dangerous weapon, you shall

25   not use or possess any illegal controlled substance, and you

1    shall not commit another federal, state, or local crime.

2        You shall also abide by the general conditions of

3    supervision adopted by the U.S. Probation Office, as well as the

4    following special conditions:  You too shall submit to the

5    collection and use of DNA information while incarcerated in the

6    Bureau of Prisons or at the direction of the U.S. Probation

7    Office.

8        You have also demonstrated that you have much to offer

9    either of the communities that you call home.  It will be a

10   condition of your supervised release that you complete 200 hours

11   of community service under the same terms: that it not be

12   political activity, that you are working to benefit disadvantaged

13   individuals under the auspices of an existing, independent,

14   philanthropic, religious, or social service organization that is

15   not affiliated with any member of your family or your extended

16   family.

17       This would mean that it does not include volunteer work at

18   your children's school, but the organization proposed in the

19   letter submitted to the Court yesterday would be appropriate.

20   To ensure that my intentions are carried out, the probation

21   department must approve both the organization and the nature of

22   the service involved.

23       As a condition of your supervised release, you shall pay

24   the balance owed on the restitution ordered in this case at a

25   rate of no less than $200 per month and provide verification of

1    payments to the probation office.  You shall also provide the

2    probation office with your income tax returns, authorization for

3    release of credit information, and information about any business

4    or finances in which you have a control or interest until the

5    restitution order has been satisfied.

6        Ms. Jackson, you have a right to appeal the sentence

7    imposed by the Court if the period of imprisonment is longer

8    than the statutory maximum or the sentence departs upward from

9    the applicable sentencing guideline range.  If you choose to

10   appeal, you must file any appeal within 14 days after the Court

11   enters judgment.  If you're unable to afford the cost of appeal,

12   you may request permission from the Court to file an appeal

13   without cost to you.

14       At this time I'm going to take a recess.  I would ask that

15   the family, obviously the defendants, and the counsel for the

16   defendants all return in 20 minutes.  So we'll resume at 1:45.

17   I would ask that the rest of the people in the courtroom, if

18   they're planning to leave to report this information or to

19   discuss this information, that No. 1, you wait till I leave the

20   bench, and then No. 2, you do it respectfully and courteously,

21   because there are a number of family members in this courtroom

22   that deserve your respect.  Thank you.

23       (Recess from 1:22 p.m. to 1:47 p.m.)

24           THE DEPUTY CLERK:  Your Honor, recalling case

25   Nos. 13-CR-58 and 13-CR-59, United States of America v. Jesse L.

1    Jackson, Jr., and United States of America v. Sandra Stevens

2    Jackson.

3              THE COURT:  Mr. Webb.

4              MR. WEBB:  Thank you, Your Honor.  We appreciate

5    Your Honor's indication to let us talk to the family and to talk

6    this through.  We've talked it through in some detail with the

7    family members and among the lawyers.  There's a very strong

8    belief and feeling and recommendation that Sandi Jackson would

9    go second and that Jesse Jackson would go first.  The family --

10   there's all kinds of family reasons, which I won't --

11             THE COURT:  I don't need to know what they are.

12   I have my thoughts about what I think would be best for the

13   children, but they are children that I've never met.  The

14   purposes of the sentences that I've imposed and the reasons

15   behind the sentences I've imposed will be fulfilled through the

16   imposition of the sentence, and on this factor I'm going to

17   defer to the family.

18        Mr. Graves, do you want to be heard on this issue at all?

19             MR. GRAVES:  No, Your Honor.

20             THE COURT:  All right.  So in the judgment and

21   commitment order for Sandra Stevens, it will say execution of

22   this judgment is stayed until -- I'm sorry, for Sandra

23   Jackson -- until Jesse L. Jackson has completed his sentence in

24   case No. 13-CR-58.  The U.S. Marshals Service and the Federal

25   Bureau of Prisons shall assign a voluntary surrender date for

1    Sandra Jackson to occur 30 days after Jesse L. Jackson, Jr., is

2    released from any custody of the Bureau of Prisons, including

3    any custody in a community correctional facility.

4          MR. WEBB:  Yes, Your Honor.  Could I at least ask,

5    just to give them a transition time, could I ask for 60 days

6    instead of 30?

7          THE COURT:  They'll know this is coming.  He's going

8    to probably be in a halfway house before he comes home.

9          MR. WEBB:  That's fine, Your Honor.  I just --

10         THE COURT:  I mean, we're already talking about her

11   serving her sentence three years from now, which is not the way

12   I would have it.  It's not really they way I think is right.

13   I'm doing this to accommodate the family.  I think that's the

14   way it's going to be.

15         MR. WEBB:  Thank you.

16         THE COURT:  I also need to put on the record that any

17   interest that might be due in connection with the restitution is

18   waived.  So anything further I need to take up on behalf of the

19   defense at this time, Mr. Webb?

20         MR. WEBB:  No, Your Honor.

21         THE COURT:  Anything further for the government?

22         MR. GRAVES:  No, Your Honor, other than are you going

23   to be posting on ECF the exact time of the November 1 forfeiture

24   hearing?

25         THE COURT:  Oh, I'm sorry.  Well, it takes some time

1    for the designation to take place.  It's already August.  If we

2    say he doesn't have to go till November and then she doesn't go

3    to -- I mean, I think I've said that he can voluntarily

4    surrender, and I've been told that really it's a family effort,

5    this disposition of assets.  So he can report when they tell him

6    to report, but I'm not going to set a date off in the future.

7    We're going to start as soon as the Bureau of Prisons says

8    they're ready.  What are you asking for?

9            MR. WEINGARTEN:  Only this.  We really do want to pay

10   them, and we had specific conversations; they know exactly what

11   we're doing.  This is all about getting another loan on his D.C.

12   house, and there are appraisals and they're dealing with

13   bankers, and it's just easier if he's not in jail.  So all we

14   want to do is just sort of take care of the obligation.

15       My sense of it is, if you said 90 days, which is about

16   normal these days because there's such a backlog, that would

17   work.  I guess if the Bureau of Prisons says show up on October

18   12, and October 19 there's a meeting at the bank, I'll come to

19   you and say give us two weeks.

20           THE COURT:  All right.  It's August 14.  Ninety days

21   is more than you asked for before.  Before you said November 1.

22   I mean, can I say after October 1?

23           MR. WEINGARTEN:  No, I think October is going to be --

24   frankly, I think October is the critical month.

25           THE COURT:  Mr. Graves, do you have a position on this?

1          MR. GRAVES:  No, Your Honor.

2          THE COURT:  All right.  I will put in the order, and I

3     haven't drafted this exact language, that his report date shall

4     be on or after November 1.

5          MR. WEINGARTEN:  Thank you.

6          THE COURT:  All right.  Is there anything further on

7     behalf of the government?

8          MR. GRAVES:  No, Your Honor.

9          THE COURT:  Anything else on behalf of the defense?

10         MR. WEBB:  No, Your Honor.

11         THE COURT:  All right.  Thank you.

12       (Proceedings adjourned at 1:52 p.m.)

*   *   *   *   *   *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE